STATE of Maine

v.

Lionel CORMIER.

Supreme Judicial Court of Maine.

Argued Nov. 9, 1987.
Decided Dec. 31, 1987.

R. Christopher Almy, Dist. Atty., Philip C. Worden (orally), Asst. Dist. Atty., Bangor, for plaintiff.

Martha J. Harris (orally), Paine, Lynch & Harris, P.A., Bangor, for defendant.

Before McKUSICK, C.J., and NICHOLS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

CLIFFORD, Justice.

The defendant, Lionel Cormier, appeals from a judgment of the Superior Court, Penobscot County, following a trial by jury in August, 1986. Cormier was convicted on two counts of robbery, 17-A M.R.S.A. § 651 (Class A) (1983), and one count of aggravated assault, 17-A M.R.S.A. § 208 (Class B) (1983). We affirm the judgment.

From the testimony of witnesses at trial, the jury could have rationally found the following facts. The victim, a drug dealer who dealt in marijuana, lived outside of Bangor in the town of East Corinth during the latter part of 1980 and early in 1981. During the late afternoon of November 26, 1980, Cormier, his half brother Paul Pollard, and two brothers they were acquainted with, Richard and Percy Sargent, plotted to rob the victim. Pollard agreed to drive the other three to and from the victim's house in exchange for $3,000.

Pollard drove the three to the victim's house early that evening. Cormier brought a rifle. They arrived at the victim's house at about 6:30 p.m. The victim was home alone. One of the Sargent brothers stood outside the house. Cormier and the other brother disguised their faces with ski masks and went in.[1] Cormier and his accomplice burst through the front door while the victim sat in his living room watching television. The men bound the victim with plastic tape and demanded he tell them where his money and drugs were.

After being kicked several times, the victim told them the location of some—but not all—of the money he had hidden. The men escaped with approximately $20,000 in cash. As the two men left, one of them jokingly said to the victim, "See you in the movies." Because of fear that attention would be drawn to his drug dealing, the victim never told the police of this incident.

In March 1981, Cormier, Pollard and a friend, Robert Smith, planned to rob the victim again. On March 27, 1981, the three set out in Smith's vehicle for the victim's house at dusk; Pollard was driving. Pollard dropped Cormier and Smith off a short distance from the victim's house at around 6:00 p.m. They both wore ski masks. Cormier carried a handgun; Smith carried a rifle. They took a walkie-talkie with them, in order to communicate with Pollard, who also had a walkie-talkie. As Cormier and Smith approached the house, they heard the victim's car approaching. They hid in some nearby bushes.

The victim was returning from Bangor, where he had attended a racquetball tournament. After the victim parked his car and had started walking towards his house, Cormier rushed up to him and pushed him to the ground. Cormier handcuffed the victim's hands behind his back and kicked him in the face, breaking one of his teeth. Cormier then pushed the victim's head into the gravel on the driveway, breaking his nose. Cormier also kicked the victim in the ribs.

Cormier took the victim's house keys out of one of his pockets. Cormier and Smith took the victim into his living room and had him lie on the floor. Cormier told the victim "[The] last time, you lied to me. This time, I want it all. We're going to get it all, all the money and all the drugs." He then kicked the victim in the ribs. The victim told Cormier where approximately $30,000 in cash and some marijuana was hidden in the house. Smith went to find the money and marijuana while Cormier continued to interrogate the victim. While

---

1. It is unclear from the record which Sargent brother went into the victim's house with Cormier.

Smith was gone, Cormier told the victim he was lying. During this time Cormier repeatedly hit him in the head and kicked him in the ribs. After several severe blows to the head, the victim begged Cormier to stop hitting him. Cormier responded by saying, "You wait 'til you see what I do to you now." Cormier ordered Smith to get him a knife. Smith, who had found the money, returned from the kitchen with a serated steak knife. Cormier then cut the victim's left ear off. The victim didn't realize what had happened until Cormier dropped his ear on the floor, in front of his face. The victim screamed in horror. Cormier and Smith then left with the money, were picked up by Pollard, and made good their escape.

The victim stumbled to a phone in the living room and called a friend who lived nearby for assistance. The victim's friend transported him to Eastern Maine General Hospital, where the victim was treated for his injuries. Because of his continued fear of exposure of his drug activities, the victim refused to discuss the incident with police officers.

This case remained unsolved until 1985. On February 12, 1985, Sergeant Barry Shuman of the Maine State Police traveled to Massachusetts, where Pollard was attending college, to interview Pollard about a murder case several years earlier in which Pollard had been a suspect. During their interview that day, Pollard felt he had to clear his conscience; he voluntarily told Shuman about his involvement in the two robberies. As a result of Pollard's confession, Smith was questioned by Shuman in November of 1985. Smith agreed to testify against Cormier. In return for Smith's testimony and his guilty plea, the State promised it would not ask for the four-year minimum sentence that would ordinarily be sought in Smith's case.[2] Pollard was not prosecuted for the robberies in exchange for his testimony against Cormier.

The Grand Jury returned an indictment against Cormier on November 5, 1985. A trial was held on August 27, 28 and 29, 1986. The State relied heavily on the testimony of Pollard and Smith. After his conviction, Cormier filed a motion to dismiss and/or for a new trial. A hearing was held on the motion in the Superior Court on December 2, 1986. The trial justice denied the motion in a written Decision and Order filed on April 15, 1987. Cormier's appeal followed.

## I.

■ On the evening of the first day of trial, August 27, 1986, the jury foreman received several phone calls. When he would answer the phone, he heard nothing on the other end of the line. The trial justice called the foreman into his chambers and questioned him about the calls in the presence of counsel for both the State and Cormier. On motion of the defendant, the trial justice then excused the foreman from further jury service. The foreman said that he had mentioned the calls to other jurors. The other jurors were called into the trial justice's chambers one at a time and questioned. Counsel for both the State and Cormier were given the opportunity to question the jurors. After the remaining jurors were questioned, the trial justice refused to grant Cormier's motion for a mistrial.

Cormier contends that the trial justice abused his discretion in refusing to grant a mistrial. The refusal to grant a mistrial will be reversed on appeal only for an abuse of discretion. *State v. Jones*, 523 A.2d 579, 581 (Me.1987). In this case, the trial justice asked each juror if she or he had heard of the phone calls. If a juror did know of the phone calls, the justice then asked if the juror had related the calls to the case and if the juror could remain impartial. The justice was able to directly observe each juror's behavior and tone of voice when responding to his queries. The justice was in a better position to assess the credibility of the jurors than we are now. *See State v. Thibodeau*, 524 A.2d

**2.** 17–A M.R.S.A. § 1252(5) provides for a mandatory minimum term of imprisonment to be imposed upon conviction of a Class A offense, such as robbery, if committed with the use of a firearm.

770, 771 (Me.1987). Considering the justice's extensive questioning of each juror, there is nothing in the record to indicate he abused his discretion in denying Cormier's motion for a mistrial.

## II.

■ Cormier next argues that he was deprived of a fair trial because of excessive courtroom security and that the trial justice abused his discretion in not granting a mistrial for this reason.

Because Cormier was regarded as an exceptional escape risk, the trial justice found, and the record indicates, that the following security measures were implemented. Two plainclothes sheriff's deputies escorted Cormier into the courtroom before the jury would enter. The deputies sat behind Cormier while the trial progressed. When the trial recessed and after the jury had left, the deputies would escort Cormier out of the room. Cormier was handcuffed, but his handcuffs were removed before he entered the courtroom. All spectators coming into the courtroom were searched outside the courtroom by sheriff's deputies before they were allowed to enter. These searches were conducted away from the main door to the courtroom and out of the jury's sight. Cormier's counsel made timely objections to these measures at trial.

Although excessive and unjustified security measures can lead to an unfair trial, see *Young v. Callahan*, 700 F.2d 32, 35–37 (1st Cir.1983), *cert. denied* 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983); *People v. McCloud*, 69 A.D.2d 957, 957, 416 N.Y.S.2d 337, 338 (App.Div.1979), those taken at this trial were not excessive or unduly prejudicial. The trial justice's factual findings are not challenged by Cormier in his appeal. Cormier simply insists that these circumstances resulted in an unfair trial. The trial justice did not abuse his discretion in refusing to grant a mistrial on the ground of excessive security.

**3.** These other interviews were conducted with Richard Sargent on December 5, 1984, and with

## III.

■ Cormier's next argument is that his conviction should be vacated because of allegedly perjured testimony. Cormier claims that Sergeant Shuman perjured himself when Shuman testified that he did not know of the robberies prior to his interview with Pollard in 1985. During cross-examination, Cormier's counsel confronted Shuman with a transcript of an interview he had conducted with Richard Sargent's wife, Sharon Sargent, on July 24, 1984. During the interview, Shuman discussed the robberies with Ms. Sargent, indicating that he had knowledge of the robberies prior to his interview with Pollard. Cormier's counsel stressed this inconsistency in Shuman's testimony in her final argument to the jury.

The alleged use of the perjured testimony was also the subject of evidence Cormier presented at the hearing on his motion for a new trial. During that hearing, Cormier introduced two other interviews conducted by Shuman, not used at trial,[3] as well as the interview with Sharon Sargent. Cormier contends that these interviews demonstrate Shuman's awareness of the robberies prior to his interview with Pollard, and that he should have been granted a new trial on that basis.

Although the knowing use of perjured testimony by the State in a criminal trial is a fundamental due process violation, see *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *State v. Brunette*, 501 A.2d 419, 423 (Me. 1985), the testimony of Sergeant Shuman on his prior knowledge of the robberies, although substantially inconsistent, does not rise to the level of being knowingly perjured. Moreover, the inconsistencies were known to Cormier's counsel and argued to the jury.

In his written Decision and Order denying the motion, the trial justice correctly noted that in order to justify the granting of a new trial on the basis of newly discovered evidence, Cormier had to satisfy the following five factors:

a David Harriman on October 16, 1984.

(1) that the evidence is such as will probably change the result if a new trial is granted, (2) that it has been discovered since the trial, (3) that it could not have been discovered before the trial by the exercise of due diligence, (4) that it is material to the issue, and (5) that it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

State v. Grover, 518 A.2d 1039, 1042 (Me. 1986), quoting State v. Lord, 458 A.2d 432, 433 (Me.1983) and State v. Estes, 418 A.2d 1108, 1114 (Me.1980). Cormier failed to meet any of these requirements. The point Cormier makes in his appeal is the same one made to the jury at trial and to the trial justice at the motion hearing. The credibility of Shuman may well have been questionable, but a credibility assessment of a witness is best left to the jury. See State v. Perry, 253 A.2d 705, 707 (Me.1969).

## IV.

█ At trial, Pollard testified as to a favorite expression routinely used by Cormier at about the time of the robberies. The expression was "See you at the movies." The victim testified that he recalled hearing one of the men say "See you in the movies" during the first robbery.

The trial justice admitted the testimony under M.R.Evid. 406(a), as evidence of Cormier's habit. Although the testimony was not admissible as habit evidence under Rule 406(a),[4] because of its tendency to identify Cormier it was certainly relevant evidence, see M.R.Evid. 401, and as relevant evidence, it was presumptively admissible, unless its admission would have unduly confused or prejudiced the jury, M.R. Evid. 403, or unless its admission was barred by a specific rule of exclusion. The trial justice did not exclude this testimony based on unfair prejudice. Nor is there any other rule of exclusion that would ap-

ply here. Pollard's testimony was not hearsay, since it was not offered for the truth of the matter asserted. See M.R. Evid. 801(c). Nor was it evidence of Cormier's bad character or disposition. See M.R. Evid. 404.

## V.

█ Cormier further contends that he should have been allowed to introduce evidence of prior crimes allegedly committed by Pollard in order to impeach him by showing bias. See M.R.Evid. 607. This bias supposedly existed because Pollard could have been motivated to implicate Cormier in the robberies in this case in order to avoid being charged for the prior crimes Pollard allegedly committed.[5] The trial justice excluded the proffered testimony and evidence as having the potential to confuse the jury. See M.R.Evid. 403. In an offer of proof, Cormier's counsel cited several burglaries and robberies to which she claimed Pollard was linked. In addition, Cormier sought to introduce evidence that implicated Pollard in the murder of a Michael Cochran, a crime about which he was being questioned by Shuman during their February 1985 interview. Pollard was never indicted for any of these alleged crimes.

Although this collateral evidence was excluded, the trial justice stated for the record that he would allow Cormier to introduce evidence of any prior convictions Pollard may have had. No such evidence was offered. Moreover, Cormier's counsel was allowed great latitude in her cross-examination of Pollard. She questioned Pollard extensively about his status as a suspect in the Cochran murder. She also questioned Pollard about his indictment for reckless conduct with a firearm in 1981. Finally, it should be noted that Cormier's counsel asked Pollard several questions about the prior bad acts in which he was

---

**4.** Habit is an individual's semi-automatic response to a given set of circumstances. See Field & Murray, Maine Evidence § 406.1 (2d ed. 1987). The only foundation laid for the admission of this testimony was that Cormier had been heard to say the expression in question "several times." This does not rise to the level

of semi-automatic response required by Rule 406.

**5.** The details of the plea bargain agreement Pollard had made with the State were elicited during direct examination.

allegedly involved, before this line of questioning was halted by the trial justice.

The trial justice's exclusion of the proffered evidence under Rule 403 will not be set aside unless it was an abuse of discretion. *See State v. McDonough,* 507 A.2d 573, 575 (Me.1986); *State v. Zaccadelli,* 472 A.2d 928, 930–31 (Me 1984). To have permitted Cormier's counsel to inquire into uncharged crimes would have resulted in great confusion, as the jury would have been subjected to the equivalent of a trial within a trial as to each uncharged crime. Considering this potential for confusion and the wide latitude the trial justice gave to Cormier for purposes of cross-examination, the exclusion of this testimony did not constitute an abuse of discretion.

## VI.

■ Cormier's final ground for appeal involves two issues. First, Cormier contends the trial justice erred by providing that part of the sentence for aggravated assault be served consecutive to the sentence for the second robbery. Second, Cormier argues that Counts II and III of the indictment (the aggravated assault and the second robbery counts) should have been merged before they were presented to the jury.

With respect to both issues, Cormier essentially argues that, when he cut off the victim's ear, it was not an act distinct from the robbery but was committed in furtherance of the robbery, as part of a "continual time sequence." It is clear from the testimony at trial, and the trial justice expressly found at the sentencing hearing, that the assault was a separate and distinct act from the robbery. Cormier and Smith had all of the money and were apparently about to leave the house. When Cormier cut the victim's ear off, the robbery had already transpired. "[T]he two offenses, although occurring at the same time, had independent factual origins." *Newell v. State,* 371 A.2d 118, 121 (Me.1977). Moreover, Cormier does not contend that the trial justice failed to comply with the consecutive sentencing requirements of 17–A M.R.S.A. § 1256 (1983 & Supp.1987). Cormier's arguments are without merit.

The entry is:

Judgment affirmed.

All concurring.