2003 ME 136

**STATE of Maine**

v.

**Jeffrey A. COOKSON.**

Supreme Judicial Court of Maine.

Argued: Sept. 10, 2003.
Decided: Dec. 1, 2003.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Atty. General (orally), Lisa P. Marchese, Asst. Atty. General, Augusta, for State.

William Maselli, Esq. (orally), Auburn, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CALKINS, J.

[¶ 1] Jeffery A. Cookson appeals from a judgment entered in the Superior Court (Penobscot County, Cole, J.), after a jury trial, convicting him of two counts of murder (17–A M.R.S.A. § 201(1)(A) (1983)). Cookson contends that testimony from a nurse practitioner should not have been admitted because the testimony was not relevant and the witness was not qualified. He also argues that he is entitled to a new trial because evidence from a firearms expert, tying Cookson to the alleged murder weapon, was false and, therefore, denied him due process. Cookson further claims that the court erred in refusing to grant him a new trial on the ground of newly discovered evidence that consisted of: (1) the recovery of the murder weapon after the trial; (2) another person confessed to committing the murders; and (3) the erroneous evidence given by the firearms expert. Additionally, Cookson appeals his consecutive life sentences, arguing that the court misapplied sentencing principles and abused its discretion. We reject Cookson's arguments and affirm his convictions and sentences.

## I. FACTUAL AND PROCEDURAL BACKGROUND

[¶ 2] The bodies of Mindy Gould, age twenty, and Treven Cunningham, age twenty-one months, were discovered in Gould's sister's home in Dexter on the morning of December 3, 1999. Gould had been residing in her sister's home, and that morning Gould was babysitting Treven, the son of her best friend. Both Gould and Treven were found lying face down on a bed with pillows over their heads. They died from single gunshots to their heads, through the pillows, from a 9mm gun.

[¶ 3] The police investigation immediately centered on Cookson. Gould and Cookson had resided together, off and on, from the time Gould was seventeen. They had lived at Cookson's mobile home in New Gloucester, and they had resided together for a short time at Gould's sister's home in Dexter. Gould had attempted to separate from Cookson, and a month before her death, she obtained a temporary protection from abuse order against Cookson following an incident in which he threatened her and the police were called. In spite of the protection order, which prohibited Cookson from having any contact with Gould, he stalked her. After a court hearing on November 30, 1999, at which Gould and Cookson appeared, the court issued a final protection order which was served on Cookson. Treven's mother testified at the protection hearing for Gould. At Cookson's murder trial, several witnesses described the relationship between Cookson and Gould and testified about Cookson stalking Gould. The jury was also given evidence of the temporary and final protection orders.

[¶ 4] As of the time of Cookson's trial, the police had been unable to locate the murder weapon, but they learned that

Cookson had been given a 9mm gun two years earlier. The police traced the ownership of that 9mm gun, learned that it was a Taurus Model PT–99–AF, and obtained the serial number for the gun. They retrieved spent bullets and shell casings from previous owners and from the home of Cookson's father, which were examined by firearms expert Brian Bachelder. It was his opinion that the Taurus Model PT–99–AF, known to have been possessed by Cookson, was the gun that killed Gould and Treven. Evidence of the chain of ownership of the Taurus Model PT–99–AF, the shell casings, and Bachelder's opinion were presented at trial.

[¶ 5] Additionally, the police located three spent bullets in the yard of Cookson's mobile home in New Gloucester. Firearms expert Charles Helms determined that one of the New Gloucester bullets had been fired from the same gun that fired the bullets obtained from the murder scene and the Gould autopsy. Those bullets as well as Helms' opinion were admitted at trial.

[¶ 6] Cookson was arrested and charged with the murders of Gould and Treven. He was denied bail. The jury trial began on November 27, 2001, and concluded with the guilty verdicts on December 6, 2001. The State argued to the jury that Cookson had a motive to kill Gould because she left him and he was losing control over her. The State emphasized that Cookson possessed the weapon that was used to kill Gould and Treven. The defense theory was that Cookson, who had denied to the police any involvement with the murders, was sleeping on his brother's couch, as his brother testified, at the time of the murders. Cookson chose not to testify. The defense did not challenge the opinions of the firearms experts or offer evidence on the murder weapon.

[¶ 7] Immediately after the jury returned the guilty verdicts, the defense counsel requested a conference with the court. Cookson's attorneys disclosed that during the course of the trial they and their investigator met with David Vantol, a prospective witness whom they believed would corroborate Cookson's alibi. Instead, Vantol confessed to the murders and to knowing the location of the murder weapon. Cookson's defense team did not think that Vantol's confession was credible enough to call him as a witness. At a subsequent meeting before the trial was concluded, Vantol again confessed to the defense attorneys that he killed Gould and Treven. However, at this second meeting he implicated Cookson as having arranged or participated in the killings. Because Vantol's second confession would be harmful to Cookson, the attorneys, with Cookson's knowledge, decided not to call Vantol to testify. In the conference with the court after the trial, the defense attorneys described Vantol's confession to the court but made no motion at that time.

[¶ 8] The case was continued for sentencing, and shortly after the trial, Cookson moved for a new trial on four grounds, three of which were on the basis of newly discovered evidence: (1) the murder weapon was discovered after trial; (2) the firearms expert learned of an error in his testimony; and (3) Vantol's confession. The fourth ground was the claim that Cookson's due process rights were violated because of the false evidence of the firearms expert.

[¶ 9] A hearing was held on the motion at which the following facts emerged. The police interviewed Vantol the same day that Cookson's trial ended, and Vantol led them to a 9mm gun hidden under a rock, which he claimed was the weapon he used to shoot Gould and Treven. This gun was a Taurus Model PT–92, not the Taurus

Model PT–99–AF that figured prominently in Cookson's trial. The recovered gun was tested, and the expert testimony at the motion hearing was that the Taurus Model PT–92 was the gun that killed Gould and Treven.

[¶ 10] Bachelder, the firearms expert, testified at the motion hearing that his opinion at trial was incorrect. The opinion he gave at trial was that shell casings obtained from previous owners of the Taurus Model PT–99–AF were fired from the same weapon that murdered Gould and Treven. He had mistaken class characteristics, that is, characteristics applicable to a class of firearms, as unique characteristics, that is, characteristics unique to a particular gun. Bachelder did not discover this mistake until after Cookson's trial when he read an article about the class characteristics of the particular model. The court found that the trial testimony of Bachelder was the result of a mistake and that neither the State nor Bachelder knew at the time that he was in error.

[¶ 11] The police conducted several interviews with Vantol after the trial, and he claimed to have killed Gould and Treven. Vantol told the police that Cookson offered to pay him $10,000 to kill Gould and that Cookson drove Vantol to Gould's sister's house on the morning of the murders. Once inside the residence, Vantol said that he pulled the gun on Gould, and when she ran to the bedroom, he shot her. According to Vantol, he then shot Treven.

[¶ 12] After Vantol's confession to the police, he received treatment at a psychiatric hospital, and he recanted his confession to his psychiatrist. Vantol testified at the motion hearing that he was not involved with the killing of Gould and Treven. He testified that Cookson, whom he had visited in jail on several occasions, told him what to say and provided him with all of the details. Vantol said he first confessed

to Cookson's lawyers, telling them that he had shot Gould in self-defense. It did not appear that Cookson's lawyers believed him, and when Vantol visited Cookson in jail, Cookson told him to tell the lawyers another version. A jail official testified and corroborated the dates of Vantol's visits to Cookson. Vantol's psychiatrist testified that Vantol had low intelligence, functioned at the level of a twelve or thirteen-year-old, and was easily influenced by others. The court found that Vantol was truthful at the motion hearing and that he had fabricated his confession at Cookson's instigation.

[¶ 13] The court denied Cookson's new trial motion, finding that he had failed to demonstrate that the murder weapon could not have been discovered before trial by the exercise of reasonable diligence. The court also held that because Vantol's confession was made to the defense team before the conclusion of the trial, it was not newly discovered evidence. With regard to the erroneous testimony of the firearms expert, the court held that the error could have been discovered before trial by reasonable diligence, and was, therefore, not newly discovered. Because the expert's opinion was based on a mistake and was not an intentional falsehood, the court concluded that Cookson was not denied due process.

[¶ 14] Cookson was sentenced a few weeks after the court issued its denial of the new trial motion. The court imposed consecutive life sentences. As factors warranting life sentences, the court relied on the multiple deaths, Cookson's history of domestic violence, and his extreme cruelty to the victims. In addition, the court focused on the premeditation aspects of the crimes, describing the planning and steps that Cookson had taken to commit the murders. In deciding to make the sentences consecutive, the court listed the ex-

treme cruelty to the victims; Cookson's history of stalking; his violation of protection orders; the incomprehensible slaying of a toddler; and the unusually serious nature of the crimes.

[¶ 15] Cookson timely appealed his convictions, the denial of his new trial motion, and the sentences. We granted Cookson leave to appeal the sentences pursuant to 15 M.R.S.A. § 2151 (2003) and M.R.App. P. 20.

## II. TESTIMONY OF THE NURSE PRACTITIONER

[¶ 16] At trial, the court admitted the testimony of a nurse practitioner who had treated Gould for depression. The State moved in limine to allow the testimony, and the court first heard the nurse practitioner's testimony out of the presence of the jury. The court found that the nurse practitioner was licensed to diagnose and treat common medical problems such as depression. Because of her license and experience, she was qualified to testify as an expert and she could testify about the diagnosis of depression as well as the history that she obtained from Gould. On appeal, Cookson challenges both the qualifications of the nurse practitioner to testify as an expert and the relevance of her testimony. Cookson preserved these challenges with timely objections.

[¶ 17] The nurse practitioner worked as a registered nurse in emergency rooms, intensive care, and floor nursing for twenty-five years. She holds bachelor's and master's degrees and is licensed as a nurse practitioner in which capacity she had worked for three years. She testified that

as a licensed nurse practitioner, she is authorized to diagnose and treat common medical problems. According to the nurse practitioner, depression is a common diagnosis and not a complex one. She is not supervised by a physician but consults with physicians on difficult cases. She is authorized to prescribe medications including narcotics.

[¶ 18] The nurse practitioner first met Gould in July 1999. The appointment was for a routine physical, and Gould talked about how depressed she was. The nurse practitioner administered a test for diagnostic purposes, and the test results demonstrated that Gould was depressed. The nurse practitioner diagnosed Gould as suffering from "depression, anxiety and situational stress secondary to emotional abuse by boyfriend." [1] She testified that Gould told her she was depressed because of her relationship with Cookson. The nurse practitioner provided medication and referred Gould to Womancare, which she described as "a peer counseling advocacy group for abused women."

[¶ 19] The nurse practitioner next heard from Gould in October when she saw her for a back injury resulting from an automobile accident. They spoke by telephone in November when Gould requested more medication for her depression, and Gould complained to the nurse practitioner that Cookson was following her. The nurse practitioner encouraged Gould to get a restraining order and to follow up with Womancare. When Gould went to the nurse's office to pick up the medication, they spoke further, and the nurse practitioner, with Gould's permission, phoned

---

1. Cookson objected to the diagnosis on the grounds that the nurse practitioner was not qualified to make the diagnosis and that the diagnosis was not relevant. He did not specifically object to the "situational stress secondary to emotional abuse by boyfriend."

During argument after the voir dire of the nurse practitioner, the State offered to delete "by boyfriend" from the diagnosis, but nothing further was said about that aspect of the diagnosis. Before the jury, the nurse testified to the full diagnosis.

the police. The nurse practitioner testified that she did so because "I wanted them to know that I felt she was in grave physical danger." At Cookson's request that last remark was stricken from the record, but his request for a mistrial was denied.

[¶ 20] Cookson argues that because there was no evidence that the nurse practitioner had any training or education in diagnosing and treating mental illnesses, and very little evidence of her experience in doing so, she was not qualified to state her opinion of the diagnosis for "depression, anxiety and situational stress secondary to emotional abuse by boyfriend." We review a trial court's determination of the qualifications of an expert under M.R. Evid. 702 for abuse of discretion.[2] *In re Jon N.*, 2000 ME 123, ¶ 8, 754 A.2d 346, 349.

[¶ 21] The State's presentation of evidence to establish the nurse practitioner's qualifications to diagnose and treat Gould's psychological condition was minimal. There was no evidence as to her training or education specific to diagnosing or treating depression or other psychological conditions. However, the court could have inferred sufficient training and experience from her testimony that she was licensed as a nurse practitioner; had a master's degree; commonly diagnosed depression; and had administered to others

the same diagnostic test that she gave to Gould.

[¶ 22] Rule 702 of the Maine Rules of Evidence provides that a person who is an expert "by knowledge, skill, experience, training, or education" may give an opinion concerning scientific, technical, or specialized knowledge. We defer to the trial court on the determination of whether the expert's qualifications are sufficient to allow the expert to testify. *See State v. Tibbetts*, 572 A.2d 142, 143 (Me.1990). As long as the expert is qualified, the extent of the qualifications goes to the weight of the expert's testimony. *In re Erika R.*, 563 A.2d 369, 373 (Me.1989). The deferential standard of review leads us to conclude that the court did not abuse its discretion in determining that the nurse practitioner was an expert for purposes of testifying about Gould's diagnosis and treatment.

[¶ 23] Cookson also argues that the nurse practitioner was not qualified to give a diagnosis because 32 M.R.S.A. § 2205–B(3) (1999) allows a nurse practitioner, who is certified and approved by the State Board of Nursing, to "perform medical diagnosis ... when these services are delegated by a licensed physician." He points out that there was no evidence that she was certified and approved by the Board and, because she testified that she acts independently and without the supervision of a physician, she does not strictly adhere to the statutory requirements for

2. In some of our cases reviewing a trial court's determination that an expert witness is or is not qualified, we have said that the standard of review is whether the court clearly erred. *See, e.g., Marchesseault v. Jackson*, 611 A.2d 95, 97 (Me.1992). In other cases, we have said that the appropriate standard of review is abuse of discretion. *See, e.g., Pelkey v. Canadian Pac. Ltd.*, 586 A.2d 1248, 1254 (Me.1991). In this case, the standard of review is abuse of discretion because there was no factual dispute regarding the knowledge, skill, experience, training, or education of the

nurse practitioner. If there were such a dispute on appeal, we would employ the same standard of review that we apply to all factual matters on review, that is, upholding such findings unless they are clearly erroneous. Here the issue is whether the nurse practitioner's knowledge, skill, experience, training, or education sufficiently qualify her to testify on Gould's medical diagnosis and treatment. When the issue is not *what* the expert's qualifications are, but whether those qualifications are adequate for the opinion of the expert, the standard of review is abuse of discretion.

making diagnoses. However, she testified that she was "licensed," which may be a short-hand term for "certified." The failure to demonstrate that she complies with section 2205–B(3) goes more to the weight of her opinion, rather than its admissibility. *See State v. Gammon,* 529 A.2d 813, 815 (Me.1987).

[¶ 24] Cookson further objects to the admission of the nurse practitioner's diagnosis on the grounds of relevance. We review a determination of relevance under a clear error standard. *Kaechele v. Kenyon Oil Co., Inc.,* 2000 ME 39, ¶ 6, 747 A.2d 167, 170. The court did not clearly err in admitting Gould's diagnosis of "depression, anxiety and situational stress secondary to emotional abuse by boyfriend." It served as background for the jury to understand other testimony from the nurse practitioner regarding the medication and referral to Womancare. Even if the diagnosis was not relevant and it was error to admit it, the error was harmless. There was a great deal of evidence by other witnesses as to Gould's mental state in the days and months preceding her death as well as the stress that she was under because of her relationship with Cookson. Also, as discussed below, Gould's own statements to the nurse practitioner about her depression and her relationship with Cookson were properly admitted. Therefore, even if it was not relevant that Gould had been given an actual diagnosis of depression, it is highly probable that the admission of the diagnosis did not affect the jury's decision, and therefore, any error was harmless. *See State v. White,* 2002 ME 122, ¶ 16, 804 A.2d 1146, 1150.

[¶ 25] Cookson's next contention is that the nurse practitioner should not have been permitted to state the cause of Gould's mental health diagnosis. The nurse practitioner testified that Gould herself had said that she was depressed because of her relationship with Cookson. Thus, whether the court erred in permitting the nurse to testify about the cause of Gould's depression is inextricably linked to Cookson's additional argument that the nurse practitioner's recitation of Gould's history was hearsay and was improperly admitted as a hearsay exception under M.R. Evid. 803(4).

[¶ 26] Rule 803(4) allows hearsay statements "made for purposes of medical diagnosis or treatment and describing ... general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." M.R. Evid. 803(4). The rationale behind the rule is "the patient's strong motivation to be truthful." M.R. Evid. 803(4) advisers' note. Here, Gould went to the nurse practitioner to receive treatment for her self-diagnosed depression. Presumably, Gould was interested in accurately relating her symptoms and the cause for them in order to receive the appropriate treatment. Gould's statements to the nurse about having a problem with Cookson and about Cookson following and stalking her were made to describe to the nurse the external source of her depression. Gould's statements were also pertinent to her treatment, including the provision of antidepressant drugs, given by the nurse practitioner. For these reasons, the court did not err in allowing the nurse practitioner to testify about the cause of Gould's depression or to recite Gould's statements to her.

### III. NEW TRIAL MOTION

[¶ 27] Shortly after the trial, Cookson moved for a new trial. M.R.Crim. P. 33. He alleged that there was newly discovered evidence consisting of: (1) Bachelder's discovery that he had been mistaken in his testimony; (2) the discovery of the actual

murder weapon; and (3) Vantol's confession. In addition, Cookson demanded a new trial on the ground that his due process rights were violated because his conviction was obtained through false testimony.

## A. Newly Discovered Evidence

 [¶ 28] We review a motion for a new trial on the ground of newly discovered evidence for clear error and abuse of discretion. *State v. Sheldon*, 2000 ME 193, ¶ 7, 760 A.2d 1083, 1085. Factual findings stand unless clearly erroneous, but the decision as to whether the defendant has met the necessary elements is reviewed for an abuse of discretion. *Id.* Furthermore, the need for finality and for the preservation of the integrity of criminal judgments causes us to regard a motion for a new trial on the ground of newly discovered evidence with disfavor. *State v. Ardolino*, 1999 ME 14, ¶ 8, 723 A.2d 870, 873.

 [¶ 29] To obtain a new trial on the ground of newly discovered evidence, a defendant must establish by clear and convincing evidence that:

(1) the evidence is such as will probably change the result if a new trial is granted;

(2) it has been discovered since the trial;

(3) it could not have been discovered before the trial by the exercise of due diligence;

(4) it is material to the issue; and

(5) it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

*Id.; State v. Dechaine*, 630 A.2d 234, 236 (Me.1993). A defendant must "make all diligent efforts to introduce into evidence any existing exculpatory facts before he may be allowed to plead [that there was a]

reasonable excuse for his failure to present that evidence." *State v. Young*, 413 A.2d 161, 162 (Me.1980) (quoting *State v. McDonough*, 350 A.2d 556, 561 (Me.1976)). "When evidence is known to the defendant at the time of trial, but its significance is not fully appreciated until after the trial, it is 'not in the legal sense newly discovered' after the trial." *Ardolino*, 1999 ME 14, ¶ 9, 723 A.2d at 873 (quoting *State v. Lund*, 266 A.2d 869, 877 (Me.1970)). The law is well settled that evidence is not newly discovered if the defendant and his attorney are aware of the evidence at the time of trial. *McDonough*, 350 A.2d at 560.

### 1. Error by Firearms Expert

[¶ 30] At trial, the State's theory was that a Taurus Model PT–99–AF was the murder weapon. This gun was never located, but there was evidence that Cookson had possessed it. Shell casings known to have been fired from this gun were obtained by the police and examined by Bachelder, a firearms expert. It was his opinion that the Taurus Model PT–99–AF was the murder weapon because characteristics of shell casings found at the murder scene were the same as characteristics of the casings obtained from former owners of this gun. After trial, Bachelder learned, when he read an article about the class characteristics of the gun, that he had mistaken a class characteristic for a unique characteristic. He promptly notified his supervisor that his testimony had been in error. The court made a factual finding that neither Bachelder nor the State knew at the time of trial that his testimony was erroneous.

 [¶ 31] Although Bachelder's error was not discovered until after trial, there is a question as to whether it could have been discovered by reasonable diligence before trial. Cookson, who must prove by

clear and convincing evidence that he could not have discovered the error before the trial, failed to meet this burden. There is no evidence that he attempted before trial to obtain an expert to independently compare the shell casings found at the murder scene with those obtained by the police from former owners of the gun. Nor is there any evidence that he sought to obtain an expert's advice on shell casing characteristics. He did not cross-examine or in any way challenge Bachelder's trial testimony.

[¶ 32] Additionally, Cookson has failed to prove that the outcome of the trial would have been different had Bachelder's error been discovered before trial. At trial another firearms expert, Charles Helms, testified that bullets obtained by the police from the yard of Cookson's house in New Gloucester had been fired from the same gun that fired the bullets obtained from the murder scene and the Gould autopsy. This evidence was independent of Bachelder's opinion and was based on the spent bullets and not the shell casing characteristics. Because Cookson has not shown that he could not have discovered the error in Bachelder's opinion prior to trial and has not shown that the outcome would have been different had he discovered the error, he is not entitled to a new trial on the basis of Bachelder's error.

### 2. Vantol's Confession

■ [¶ 33] Vantol's confession was known to Cookson during the trial and is not newly discovered evidence. For tactical reasons, Cookson and his attorneys decided not to disclose the confession during trial or call Vantol to testify. A confession by an alternative suspect known to the defense at the time of trial is not newly discovered evidence. *McDonough,* 350 A.2d at 560. Thus, Cookson has failed to demonstrate by clear and convincing evidence that Vantol's confession was newly discovered.

■ [¶ 34] Even if the confession was newly discovered, Cookson did not show clearly and convincingly that it would have changed the outcome of the trial. The motion court found that Vantol's confession was not credible. This finding is supported by the evidence of the versions of the confession that Vantol made to the defense team and to the police; Vantol's visits to Cookson in jail and the timing of those visits; Vantol's recantation; and his mental and psychological characteristics. Furthermore, the version of Vantol's confession that he gave to the police implicated Cookson in a murder for hire scheme, which, as the trial court noted at Cookson's sentencing, would have made Cookson guilty of murder and supported a life sentence. *See State v. Shortsleeves,* 580 A.2d 145, 149 (Me.1990) (holding that an aggravating circumstance that justifies a life sentence is "a planned, deliberate killing including a killing for hire").

### 3. Murder Weapon

■ [¶ 35] Cookson has also failed to show that the actual murder weapon could not have been discovered with reasonable diligence before the trial was over. Although the weapon was not actually recovered from its hiding place until after the trial, Vantol told Cookson's defense team during the trial that he knew where the murder weapon was located. In addition, Cookson has not proven clearly and convincingly that the discovery of the murder weapon would have changed the outcome of the trial. As Helms testified, the murder weapon was, in fact, the gun that fired a bullet found at Cookson's New Gloucester home, thus linking Cookson to it.

### B. Due Process Claim

■ [¶ 36] Cookson claims that he is entitled to a new trial because his right to

due process was violated when the State used false evidence. The false evidence, he argues, is Bachelder's ballistics testimony which led to his opinion testimony that the Taurus Model PT–99–AF was the murder weapon. Cookson relies on *State v. Brunette*, 501 A.2d 419, 423 (Me.1985) and *State v. Cormier*, 535 A.2d 913, 916 (Me. 1987) for the proposition that the knowing use of false testimony violates a defendant's right to due process. The testimony claimed to be false here was found by the motion court to be mistaken testimony, and the mistake was not known to either the witness or the State at the time the testimony was given. In *Brunette*, the witness knew that her testimony was false, 501 A.2d at 423, and, in *Cormier*, we concluded that the testimony was inconsistent but did "not rise to the level of being knowingly perjured," 535 A.2d at 916. Because there was no knowing use of false testimony, Cookson's due process rights were not violated.

## IV. SENTENCE APPEAL

[¶ 37] Cookson appeals the imposition of two consecutive life sentences. Pursuant to 15 M.R.S.A. § 2151 (2003) and M.R.App. P. 20, the Sentencing Review Panel of this Court granted Cookson's application to appeal his sentence. He argues that the Superior Court misapplied sentencing principles in determining that life sentences were appropriate for both murders and that it abused its discretion in making the two sentences consecutive.

[¶ 38] The authorized range of a sentence of incarceration for murder is twenty-five years to life. 17–A M.R.S.A. § 1251 (Supp.2002) *amended by* P.L.1999, ch. 536, § 1. In imposing a murder sentence the trial court utilizes a two-step process. *Id.* §§ 1201(1)(A), 1252–C. The first step determines the basic period of incarceration by examining the crime, the defendant's conduct in committing it, and by looking at other sentences for similar offenses. *Id.* § 1252–C(1); *Ardolino*, 1997 ME 141, ¶ 24, 697 A.2d at 80–81. Relevant factors for consideration in the first step include the force and duration of the crime, *State v. Michaud*, 590 A.2d 538, 542–43 (Me.1991), and the defendant's motive, *State v. Jackson*, 1997 ME 174, ¶ 11, 697 A.2d 1328, 1331. The second step looks at any mitigating or aggravating factors of the defendant. 17–A M.R.S.A. § 1252–C(2) (Supp.2002). We review de novo the first step of the process for misapplication of principle, *Ardolino*, 1997 ME 141, ¶ 24, 697 A.2d at 80–81, while our standard of review for the second step is abuse of discretion, *State v. MacDonald*, 1998 ME 212, ¶ 17, 718 A.2d 195, 200.

[¶ 39] In imposing the sentence the court discussed the fact that Gould's murder was a crime of domestic violence and that there was a court order prohibiting Cookson from having contact with Gould. The court detailed evidence of Cookson's premeditation-in-fact, that is, his conduct in the few days preceding the murders, which involved his arrangements to use another car and for an alibi. The court found that Cookson acted with extreme cruelty and that as soon as he showed his gun, Gould had to have been aware that she was going to die at his hands and that she feared what would happened to Treven. Gould's special relationships with Treven and his mother were noted by the court, and the court spoke of the revenge motive that Cookson had for killing Treven.

[¶ 40] The court referred to *Shortsleeves*, 580 A.2d at 149–50, and its list of aggravating circumstances to be considered in imposing a life sentence. The court found that this case included several of the *Shortsleeves* circumstances: (1) premeditation-in-fact, meaning a "planned, deliberate killing"; (2) multiple deaths; and

(3) murder "accompanied by extreme cruelty."[3] *Id.* The court imposed life sentences for both murders because of these circumstances.

[¶ 41] We have said that a basic sentence will survive appellate scrutiny unless it appears "to err in principle." *State v. Hallowell,* 577 A.2d 778, 781 (Me.1990). We can discern no error in principle in the court's conclusion that life sentences are appropriate basic sentences.

[¶ 42] We also find no abuse of discretion in the court's determination that there were no mitigating factors to be balanced against the aggravating factors. Cookson argued that the court should have given some weight to the version of Vantol's confession in which Vantol and not Cookson pulled the trigger, but this argument lacks merit as the court found that it did not believe the confession.

[¶ 43] Finally, we consider the imposition of the life sentences for the two murders as consecutive sentences. Consecutive sentences are authorized in 17–A M.R.S.A. § 1256(2) (1983 & Supp.2002), but they can only be imposed in certain circumstances. One of those circumstances is when "the seriousness of the criminal conduct ... require[s] a sentence of imprisonment in excess of the maximum available for the most serious offense." *Id.* § 1256(2)(D) (1983). We have interpreted that phrase to mean "when the criminal conduct is unusually serious." *State v. Walsh,* 558 A.2d 1184, 1188 (Me. 1989). We review the imposition of consecutive sentences for abuse of discretion. *State v. Prewara,* 687 A.2d 951, 954 (Me. 1996).

[¶ 44] There can be no doubt that Cookson's conduct and method in murdering

both Gould and Treven was unusually serious. The court was entitled to consider those same factors that led it to impose life sentences when it decided whether consecutive sentences were warranted: that is, the extreme cruelty; the planning; the execution nature of the murders; Cookson's stalking of Gould; and his history of domestic abuse. No abuse of discretion is apparent in the imposition of two consecutive life sentences.

The entry is:

Judgment and sentences affirmed.

---

**3.** Other factors listed in *Shortsleeves* include: murder by a defendant who was previously convicted of homicide or other deadly force crime; murder committed in a penal institution; murder of a law enforcement officer; and murder of a hostage. *State v. Shortsleeves,* 580 A.2d 145, 150 (Me.1990).