Majority: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, and GORMAN, JJ.
Dissent: JABAR, J.
GORMAN, J.
[¶ 1] In this third appeal stemming from Jeffrey A. Cookson’s 2002 conviction of two counts of intentional or knowing murder, 17-A M.R.S.A. § 201(1)(A) (1983),[1] Cookson challenges a decision of the court {Cole, J.) denying, for the second time, his motion for post-conviction DNA analysis of certain evidence. Cookson contends that the court held him to a higher standard of proof than is required pursuant to the post-conviction DNA statute, 15 M.R.S. §§ 2136-2138 (2010),[2] and that the court erred in finding that Cookson did not establish the requisite elements to obtain such testing. We affirm the judgment.
I. BACKGROUND
[¶2] In 2001, a jury found Cookson guilty of the intentional or knowing murder of Mindy Gould and the young child she was babysitting at the time.[3] See 17-A M.R.S.A. § 207(1)(A). The court {Cole, J.) imposed two consecutive life sentences.
[¶3] Among the arguments Cookson made in his direct appeal of the judgment of conviction was his contention that the court erred in denying his motion for a new trial on the ground of newly discover *1188 ed evidence. State v. Cookson (Cookson I), 2003 ME 136, ¶¶7-13, 27-36, 837 A.2d 101; see M.R.Crim. P. 33. We affirmed the judgment after determining that the evidence was not “newly discovered” within the meaning of Rule 33, and that even if it were, it would not have changed the outcome of Cookson’s trial.[4] Cookson I, 2003 ME 136, ¶¶ 28-29, 32, 33-34, 837 A.2d 101.
[¶ 4] In 2004, and again in 2008, Cook-son filed motions seeking post-conviction DNA analysis of some of the evidentiary items that were the subject of his motion for a new trial. See 15 M.R.S. §§ 2137, 2138. The court denied the motions, and Cookson then commenced a second appeal related to his conviction, which resulted in our decision in Cookson v. State (Cookson II), 2011 ME 53, 17 A.3d 1208; see 15 M.R.S. § 2138(6); M.R.App.P. 19.
[¶ 5] In Cookson II, we interpreted the post-conviction DNA statute, which requires the moving party to present prima facie evidence of five criteria:
A. A sample of the evidence is available for DNA analysis;
B. The evidence to be tested has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way;
C. The evidence was not previously subjected to DNA analysis or, if previously analyzed, will be subject to DNA analysis technology that was not available when the person was convicted;
D. The identity of the person as the perpetrator of the crime that resulted in the conviction was at issue during the person’s trial; and
E.The evidence sought to be analyzed, or the additional information that the new technology is capable of providing regarding evidence sought to be reanalyzed, is material to the issue of whether the person is the perpetrator of, or accomplice to, the crime that resulted in the conviction.
15 M.R.S. § 2138(4-A); see 2011 ME 53, ¶ 7, 17 A.3d 1208. We also noted that 15 M.R.S. § 2138(5) requires the motion court to issue written findings of fact in granting or denying a request for post-conviction DNA analysis. Cookson II, 2011 ME 53, ¶ 9, 17 A.3d 1208. Because the court had not made the required findings, we vacated and remanded the matter to the Superior Court for it to do so. Id. ¶¶ 9,18.
[¶ 6] We also clarified one of the five requirements for post-conviction DNA analysis, and the only requirement that was truly in dispute — chain of custody.[5] Id. ¶¶ 10-18; see 15 M.R.S. § 2138(4-A)(B). We noted that “[t]he central point of the chain of custody requirement is to assure that the evidence is what it purports to be — that is, related to the crime— and that it has not been contaminated or tampered with such that testing of it will yield unreliable (and therefore irrelevant) results.” Cookson II, 2011 ME 53, ¶ 17,17 A.3d 1208. We held that a chain of custody consideration must account for any period of time in which the evidence could have been contaminated or tampered with, which in Cookson’s case begins with the day of the murders. Id. ¶¶ 17-18.
[¶ 7] On remand, the trial court conducted a second testimonial hearing on *1189 Cookson’s motion for DNA analysis. By agreement of the parties, the court also considered all of the evidence from the hearing on Cookson’s initial motion for a new trial and the first hearing on his post-conviction DNA motion. The extensive findings issued by the court after its consideration of the entire record illustrate the unusual sequence of events preceding Cookson’s motion for post-conviction DNA analysis.
[¶ 8] Before he went to trial for the murders, Cookson was aware that one of his acquaintances, David Vantol, had confessed to the private investigator retained by Cookson’s attorney that he, rather than Cookson, had killed the victims. In Van-tol’s first confession, he asserted that he had killed them in self-defense. Cookson’s attorney did not find Vantol’s self-defense confession credible. As Cookson’s trial was being heard, Cookson’s private investigator spoke to Vantol again; Vantol changed his story from one of self-defense to one of murder-for-hire committed at Cookson’s request. Cookson and his attorneys were aware of both versions of Vantol’s confession. Despite their knowledge of Vantol’s revised story, or perhaps because of it, Cookson and his attorneys decided not to call Vantol as a witness during the trial. In addition, they decided not to tell the prosecution or the trial court of either version of Vantol’s confession until after the verdict was rendered in Cook-son’s trial.
[¶ 9] As a result of these decisions by Cookson, neither the prosecutors nor the investigating Maine State Police detectives were aware of any version of Vantol’s confession while the trial was being heard. Rather, it was not until December 6, 2001, after the jury returned its verdict finding Cookson guilty of two counts of murder, that Cookson’s attorneys finally notified the prosecutors and the trial court that Vantol was claiming to have been involved in the murders.
[¶ 10] Detectives immediately met with Vantol. Among the first versions of the story Vantol gave was one — which he later recanted — in which he stated that Cookson approached him in 1999 to kill Gould in exchange for $10,000. Vantol explained that he agreed to Cookson’s proposal, and further explained how he carried out his part of the bargain. Vantol stated that on the morning of December 3,1999, Cookson drove him to a convenience store where Cookson bought him a pair of brown gloves; Cookson then gave Vantol a gun and eventually dropped him off at Gould’s home. When Gould answered the door, Vantol followed her into the home and shot her. Vantol explained that he shot the child just because the child was present.
[¶ 11] To corroborate his confession, Vantol offered to provide the detectives with the gun he used to commit the murders and the clothing he wore at the time of the murders; he first claimed to have been wearing sneakers, flannel pants, a flannel jacket, an Adidas hat, and the brown gloves, but later claimed he wore jeans, a t-shirt, and a flannel shirt along with the sneakers and gloves. Vantol stated that he had buried those items, as well as the gun[6] and a wig that Cookson wore that day, on property owned by Scott Cookson, Cookson’s brother.
[¶ 12] That very night, December 6, 2001, Vantol led detectives to a location in the woods on Scott Cookson’s property where he quickly unearthed a gun that turned out to be the murder weapon. See Cookson II, 2011 ME 53, ¶ 3, 17 A.3d 1208; Cookson I, 2003 ME 136, ¶ 9, 837 A.2d 101. Vantol repeatedly refused to lead the de *1190 tectives to where the other items were buried, but two days later, on December 8, 2001, he did provide them with a green plastic trash bag containing various items of clothing that he stated he had dug up on Scott Cookson’s property. The bag contained only a pair of blue sneakers, a size XL jean jacket with pink stains that appeared to be bleach stains, a plaid flannel insulated shirt, a black wig, and a fluorescent orange knit hat. The police noted that the items were “very wet and brittle” and had roots and grass mixed in.
[¶ 13] Vantol, who has limited cognitive functioning, was admitted to Acadia Hospital soon afterward. After being treated at the hospital, Vantol recanted his earlier confessions and informed the detectives that he had not been involved with the murders, had pulled the clothing items out of a junk car, and knew where the gun was based on Cookson’s directions. Vantol stated that he had fabricated his involvement with the murders at Cookson’s specific request.
[¶ 14] Cookson is now attempting to obtain post-conviction DNA testing of the clothing that Vantol gave the detectives in 2001. On remand, the trial court concluded that Cookson failed to present his pri-ma facie evidence that the clothing had not been substituted, tampered with, replaced, or altered between the time of the murders and the time Vantol gave the items to the police, for two reasons. First, the court found that there was a two-year gap in the chain of custody in that Cookson offered no evidence “as to the condition and circumstances that existed at the Scott Cookson trailer and junkyard [from] the date of the homicides on December 3, 1999[,] to the time David Vantol turned over the items to [detectives] on December 8, 2001.” The court referenced evidence showing that law enforcement officers searched the “large area of woods and open area” that comprised the junkyard on December 17, 1999, which included a video of “[h]eavy equipment ... shown moving large metal items and junked cars over a considerable area,” suggesting that items in the junkyard might have been moved in the intervening years.
[¶ 15] Second, the court found that there was “very little, if any, evidence that the clothes and sneakers have not been substituted, tampered with, replaced or altered in any way,” particularly given that when Vantol turned the items over to the police, the clothing clearly was not in the same condition as when it was last worn. On these two grounds, the court denied Cookson’s motion for post-conviction DNA testing a second time. Cookson filed this third appeal. See 15 M.R.S. § 2138(6); M.RApp. P. 19.
II. DISCUSSION
[¶ 16] Cookson now challenges the court’s finding that he had not presented the required prima facie evidence as to the chain of custody. We defined prima facie evidence, as used in the post-conviction DNA statute, in Cookson II:
Prima facie in this context regards the preliminary burden of production of evidence; it requires proof only of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party’s favor. Prima facie evidence requires only some evidence on every element of proof necessary to obtain the desired remedy. Thus, prima facie proof is a low standard that does not depend on the reliability or credibility of the evidence, all of which may be considered at some later time in the process.
2011 ME 53, ¶ 8, 17 A.3d 1208 (footnotes omitted) (citations omitted) (quotation marks omitted). Notwithstanding this low evidentiary burden, we will disturb the court’s determination that Cookson failed *1191 to carry his burden only if “the evidence compelled the court to find to the contrary.” Laferriere v. State, 1997 ME 169, ¶ 6, 697 A.2d 1301 (quotation marks omitted).
[¶ 17] The trial court’s first ground for denying Cookson’s motion— that Cookson failed to account, even on a prima facie basis, for the location of or circumstances surrounding the clothing during the two years between the murders and the time Vantol gave detectives the trash bag — is amply supported by the record. Even when considering the evidence from the 2002 hearing on Cookson’s motion for a new trial, during which Vantol testified, in addition to the evidence from the first hearing on Cookson’s motion for DNA analysis, there simply was no testimony from any source at any stage of the proceeding suggesting that Vantol ever said that the clothes remained where he buried them during the two years between the murders and his confessions, nor any evidence on which to base a reasonable inference of that fact.[7]
[¶ 18] The court’s second ground for denying the motion — that there was little or no evidence that the clothing items had not been substituted, tampered with, replaced, or altered, particularly given that when Vantol turned the items over to the police, the clothing clearly was not in the same condition as when it was last worn— is also supported by the record. The record contains no evidence that Vantol ever stated that he knew or believed that no one had tampered with the clothes since they were buried. The junkyard area was, as the court noted, a “large area of woods and open area” and, on at least one occasion during the two-year period in question, the area was disrupted by heavy earth-moving equipment. Vantol was not the owner of the property where he said the clothing was buried, and had no control over what happened on or to the property.
[¶ 19] Also essential to this portion of the analysis are the significant differences between the clothing Vantol described and the clothing he turned over to detectives. Most importantly, the clothing Vantol turned over did not include two specific items of clothing that he told the detectives he had worn and buried, that is, the jeans and the gloves. The court also found that the sneakers were in better condition than the clothes, that the clothing would not fit Vantol, and that the clothing was not similar to the type of clothing Vantol was ever seen wearing. Leaving aside Vantol’s later recantations, and independent of Vantol’s level of credibility given his ever-changing story, the clothing he turned over in 2001 does not even grossly match the clothing he said he had worn while committing the murders. Given these marked inconsistencies, we cannot say that the post-conviction court erred in determining that the clothing was not in the “same condition” as when it was last said to be worn, even when applying the low prima facie standard.[8]
[¶ 20] The point of establishing a chain of custody is to demonstrate that the evidence presented for testing is evidence that is germane to the case, and that it has not been tampered with. Cookson II, 2011 ME 53, ¶ 17, 17 A.3d 1208. Here, the evidence presented in support of Cook- *1192 son’s petition demonstrated that the bag of clothing Vantol produced contained fewer than all of the items he had promised, and that it had been obtained from a site owned by Cookson’s brother after a two-year period during which Cookson was unable to account for its location or condition at all. Given the state of the record, the post-conviction court was not compelled to find that Cookson had established, on a prima facie basis, that the clothing was related to the murders and that it had not been moved or tampered with during the two years between the murders and the time the clothing was produced. Thus, the trial court did not err in determining that Cookson failed to establish the chain of custody necessary to obtain an order for post-conviction DNA analysis.
The entry is:
Judgment affirmed.

. Title 17-A M.R.S.A. § 201(1)(A) has since been amended. P.L. 2001, ch. 383, § 8 (effective Jan. 31, 2003).

. Title 15 M.R.S. § 2138 has since been amended, P.L. 2011, ch. 230, §§ 1-2 (effective Sept. 28, 2011); P.L. 2011, ch. 601, § 13 (effective Aug. 30, 2012); P.L. 2013, ch. 266, § 6 (effective Oct. 9, 2013), but those amendments are not material to this appeal.

.The details of the crimes are described in greater detail in State v. Cookson (Cookson I), 2003 ME 136, ¶¶ 2-6, 837 A.2d 101.

. Cookson’s sentence review appeal was considered, and affirmed, along with his direct appeal. Cookson I, 2003 ME 136, ¶¶ 37-44, 837 A.2d 113.

. The parties have stipulated to the remaining four requirements in section 2138(4-A). The parties also do not dispute the chain of custody from the time the items came into police possession.

. Vantol claimed that he subsequently moved the gun in case he needed it.

. As mentioned earlier, in one version of his story, Vantol himself unearthed the evidence to retrieve and remove the gun he had initially buried with the clothing.

. The court also found that the items were “degraded, soiled, and had organic material attached to them.” Such a finding alone, however, will not support a determination that the clothing was in a different condition than on the day of the murders.