**STATE of Maine**

v.

**Gary M. RAINEY.**

Supreme Judicial Court of Maine.

Argued Sept. 4, 1990.
Decided Oct. 1, 1990.

James E. Tierney, Atty. Gen., Eric Wright, and William Stokes (orally), Asst. Attys. Gen., Augusta, for the State.

William Maselli (orally), Andover, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, COLLINS and BRODY, JJ.

McKUSICK, Chief Justice.

Defendant Gary Rainey appeals his convictions entered after jury trial in the Superior Court (Oxford County, *Bradford, J.*) for the intentional or knowing murder of his stepdaughter and her fiancé, 17–A M.R.S.A. § 201(1)(A) (1983), and for an attempt to murder his stepson with a firearm, 17–A M.R.S.A. §§ 152(1), 201(1)(A), and 1252(5) (1983). Defendant raises several issues concerning the jury instructions. He argues that the trial court erred in denying his requested instructions on adequate provocation manslaughter and self-defense on the murder counts, in failing to instruct the jury on adequate provocation on the attempted murder count, and in giving an instruction on witness credibility. Defendant also challenges the admission of statements he made during a psychiatric evaluation. Finally, defendant challenges remarks made by the prosecutor in his opening and closing statements. Finding no merit to defendant's arguments on any of the issues raised, we affirm the convictions.

## Facts

In May 1983 defendant Rainey married Madelyn Coolidge, a woman he had dated when they were teenagers. The marriage was a second one for both of them. The couple lived in a house in Locke Mills that defendant had bought before the marriage. At various times during the next five years, some of Madelyn's adult children from her earlier marriage lived with them.

In January 1988 the Raineys began to discuss divorce. In April defendant and Madelyn listed the house with a realtor, and he agreed to split the proceeds from the sale with her. In June Madelyn moved to Michigan without telling defendant. Defendant stayed in the Locke Mills house with his stepdaughter Kim Shriver along with Kim's two young daughters and her fiancé Chris Greska. During that summer, defendant left Maine to work at a variety of short-term jobs in Massachusetts, and Kim and Chris moved to their own home in Bethel. The Locke Mills house remained empty until the beginning of October, when defendant's stepson Barry Coolidge sought and received permission from his mother, but not from defendant, to move there and assume its payments.

On October 22 defendant drove from Massachusetts to South Paris to visit his brother. While there, he called his real estate agent and learned from her for the first time that the Locke Mills house was off the market and that Barry had moved or was planning to move into it. Defendant told the agent that "he is like hell." The agent told defendant to call her after he had straightened things out, to which defendant responded, "if he lives that long."

Defendant got in his car, where he kept a .22 caliber pistol, and drove to the Locke Mills house. When he entered the house with the pistol, Barry was coming from the kitchen into the entrance hall near the front door. Barry's dog charged defendant, and defendant shot the dog twice. Barry tried to grab the gun, but fell over on his back, apparently shot. He testified that the next thing he remembered was being on the ground with the gun in his face and covering his face with his hands. When he regained consciousness, alone in the house, he felt numbness and pain. He stumbled outside, where a neighbor was approaching, and was eventually taken to the emergency room at Stevens Memorial Hospital in Norway. He was treated there for multiple gunshot wounds. With emergency surgery, Barry survived.

The neighbor, summoned to the house on hearing no less than six gunshots, testified that he saw defendant leave the house, walk quickly to a black car, drive toward Route 26, and head north toward Bethel. Defendant testified that he was going to Kim and Chris's house in Bethel to talk to them about property of his that he thought they had taken from the Locke Mills house. He testified that when he walked inside, Kim said to him, "What are you doing in my house?" Chris stepped forward, with a hammer and drill in his hands, and defendant shot him. Kim came toward defendant and he shot her. Chris got up, and defendant shot him again. When he fell to the floor, defendant hit him with the hammer that Chris had been carrying. Unbeknownst to defendant, Kim's two daughters were present in the house during the shootings. The older child testified that she heard gunshots and that she saw a black car drive away. The younger child testified that she saw defendant shoot her mother and Chris. Both victims died from multiple gunshot wounds and head trauma.

After leaving the Bethel house, defendant went back to his brother's in South Paris. Upon greeting his brother, defendant asked him if he would like to shake the hand of a murderer who had just shot three people, and asked his brother to call the sheriff. Defendant himself spoke with the police dispatcher. After stopping at Ames Department store to buy underwear and some changes of clothing, defendant drove to the Oxford County jail to turn himself in. Defendant was indicted, tried before a jury, and convicted for the knowing and intentional murder of Kim Shriver and Chris Greska, and for the attempted murder of Barry Coolidge.

## I.

### *The Jury Instructions*

■ **A.** Defendant first argues that the trial court erred in refusing to instruct the jury on adequate provocation manslaughter and self-defense as affirmative defenses to the two murder charges. Based on the court's determination that the evidence before the jury was not sufficient to raise a reasonable doubt as to the existence of either defense, there was no error in denying defendant's requested instructions. *See* 17–A M.R.S.A. § 101(1) (1983); *see also State v. Moore*, 577 A.2d 348, 350 (Me.1990) ("[w]hether a jury should be instructed on a particular defense in a criminal case almost always depends on whether the evidence presented at trial generates the defense").

■ On the evidence presented at trial, a jury would have been unable to find adequate provocation manslaughter. Adequate provocation is an affirmative defense to murder if it is not induced by the actor and "[i]t is reasonable for the actor to react to the provocation with extreme anger or extreme fear." 17–A M.R.S.A. § 201(4) (Supp.1989). Even if Kim and Chris had taken some of defendant's belongings, the trial court did not abuse its discretion in determining that provocation to be too remote from the killings to warrant the defense, given our recognition that " 'there are definite limitations on the type of conduct deemed legally *adequate* to mitigate the punishment for a felonious homicide.' " *State v. Flick*, 425 A.2d 167, 173 (Me.1981) (quoting *State v. Hilliker*, 327 A.2d 860, 865 (Me.1974)) (decided before the adoption of the present Criminal Code; emphasis in original). Furthermore, by denying that he intended to take his anger against his wife out on her children, defendant foreclosed resort to the argument that his anger at her was reasonably directed toward her children. *See Tribou v. State*, 552 A.2d 1262, 1265 (Me.1989). Finally, even if defendant was fearful of Chris because he was holding a hammer, anything that happened at the Bethel house as a matter of law could not have been adequate provocation because it was induced by defendant who had no legal right to be there. *See* 17–A M.R.S.A. § 201(4) (provocation may be adequate if "[i]t is not induced by the actor").

■ For the same reason, an instruction on self-defense would have been erroneous; a jury could not have made a rational finding in support of that theory. *See State v. Philbrick*, 481 A.2d 488, 492–93 (Me.1984). The evidence established that defendant was the aggressor, that he was illegally on the victims' property, and that he had the duty and the opportunity to retreat from the house in safety. In these circumstances, defendant's use of deadly force could not have been justified as self-defense. *See* 17–A M.R.S.A. § 108(2)(C) (1983).

■ **B.** For the first time on appeal, defendant argues that the trial court erred by failing to instruct the jury on adequate provocation to the attempted murder. Because he made no request for this instruction at trial, defendant can prevail on this issue only if the trial court's failure to give it on its own initiative amounted to obvious error. *See* M.R.Crim. 30(b); *see also State v. True*, 438 A.2d 460, 467 (Me.1981).

■ On the evidence presented, the adequate provocation defense was no more an available defense to the attempted murder charge than it was to the murder charges. Even if Barry Coolidge angered defendant by moving into his house, from the time defendant learned that Barry was living there to the time that he arrived in Locke Mills, defendant had sufficient opportunity to take a reasonable course of action. The jury could not rationally conclude that the news that Barry was living in defendant's house, even when combined with defendant's ongoing anger at his wife, was adequate provocation for his use of deadly force against Barry. Furthermore, unlike adequate provocation as a defense to murder, which is expressly provided for by 17–A M.R.S.A. § 201(3) (Supp.1989), there is no statutory provision for adequate provocation as a defense to attempted murder. There was no obvious error in the trial court's failure to give that instruction *sua*

*sponte* because the defense of adequate provocation to attempted murder was not obviously available. In any event, we need not decide that issue here.

C. Defendant finally challenges the trial court's jury instruction on witness credibility, arguing that it improperly shifted the burden of proof to him from the State. Because there was no objection to the instruction at trial, our review is once again limited to determining whether the court committed obvious error. When read together with the instructions on the State's burden of proving guilt beyond a reasonable doubt, the instructions on witness credibility did not shift the burden of proof. *See State v. Perry*, 486 A.2d 154, 156 (Me. 1985). We find no error at all, least of all obvious error.

## II.

### *Defendant's Admissions in the Court–Ordered Forensic Examination*

■ As part of his case in defense, defendant presented the testimony of Dr. Brian Rines, a clinical psychologist, in an attempt to establish an "abnormal condition of the mind" defense to the crimes with which he was charged. *See* 17–A M.R.S.A. § 38 (1983). Dr. Rines testified that he had examined defendant, reviewed reports prepared by other mental health professionals, and administered two standardized personality tests. He diagnosed defendant as having a borderline personality disorder that degenerated into "an extreme psychological state that distorted his ability to perceive things" after defendant learned that his house had been taken off the market.

To meet defendant's "abnormal condition of the mind" defense, the State on rebuttal presented the testimony of Dr. Neil MacLean, a psychologist who had examined defendant before trial pursuant to a court order entered at the defendant's request. Dr. MacLean had performed an evaluation of defendant's "mental condition with reference to the issues of criminal responsibility and competence to stand trial." 15 M.R.S.A. § 101–B(1) (Supp.1989). During that

section 101–B examination, defendant admitted that he had reloaded his weapon on the way from Locke Mills to Bethel because "it occurred to me that I had to do a good job."

Defendant now claims that the admission of the State psychologist's testimony deprived him of a fair trial. Because defendant did not object to the testimony at trial, its admission is reviewed only for obvious error. We conclude that there was no error at all in the admission of the testimony once defendant put his mental state at issue as a defense to all three counts. Although M.R.Evid. 503(c) gives a criminal defendant the right to prevent anyone else from disclosing communications made during the course of a court-ordered psychiatric evaluation, M.R.Evid. 503(e)(3) creates an explicit exception to the privilege once the defendant raises his mental condition as a defense. *See State v. Doughty*, 554 A.2d 1189, 1191 (Me.1989).

## III.

### *The Prosecutor's Opening and Closing Statements*

Defendant's final contentions are that the prosecutor made prejudicial statements in both his opening and closing statements to the jury. Because defendant did not object to these comments when they were made, we again review the record only for obvious error.

■ We find no error at all in the prosecutor's reference in his opening statement to a fact later found to be inadmissible. In his opening, the prosecutor told the jury that defendant "told his wife ... that he would rather see her dead than away from him." When Madelyn testified, the prosecutor asked her if defendant had ever told her what would happen if she left him. Defense counsel objected to the question. The prosecutor made an offer of proof, arguing that Madelyn's testimony established defendant's motive. The trial court sustained the objection on the ground that it showed motive toward Madelyn, but not toward the victims. On the basis of the record, the prosecutor had a reasonable

belief that the testimony would be offered and admitted at trial. Without some showing that the reference was not made in good faith, defendant cannot claim that the trial was unfair. *See State v. Bernier,* 486 A.2d 147, 149 (Me.1985).

 Defendant also contends that the prosecutor misstated the *mens rea* requirement for intentional and knowing murder in his closing argument. In his opening statement to the jury, defense counsel had said:

> [I]n part and in addition to many other things you're going to decide is whether or not this defendant, Gary Rainey, on October 22nd had a guilty mind, whether or·not he had a vicious will or an evil mind and that is no small job.

In his closing argument, the prosecutor responded to that opening statement of the defense. He argued that the State did not have to prove defendant had

> an evil mind or a vicious will because that's a question of why·he did what he did, a question of motive, a question of his purpose, a matter which the State does not have to prove.

Even if the prosecutor's argument may have incorrectly suggested to the jury that the State did not have to prove beyond a reasonable doubt that defendant acted with any *mens rea,* we find that those remarks were not prejudicial in light of the trial court's explicit direction to the jury that it should follow only the court's instructions on the controlling legal principles and not the argument of counsel.

The entry is:

Judgment affirmed.

All concurring.