1999 ME 24

**STATE of Maine**

v.

**Harold PULSIFER.**

Supreme Judicial Court of Maine.

Submitted on Briefs Nov. 20, 1998.

Decided Feb. 9, 1999.

Andrew Ketterer, Attorney General, Donald W. Macomber, Asst. Atty. Gen., William Stokes, Asst. Atty. Gen., Augusta, for State.

Walter F. McKee, Lipman & Katz, P.A., Augusta, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Harold Pulsifer appeals from the judgment of conviction entered in the Superior Court (Kennebec County, *Marden, J.*) following a jury waived trial at which he was found guilty of murder in violation of 17–A

M.R.S.A. § 201(1)(A) (1983).[1] Pulsifer contends that his conviction for murder should have been reduced to manslaughter, and that the trial court erred in finding that he did not meet his burden of showing that he was adequately provoked in causing the death of Wrendy Hayne, pursuant to 17–A M.R.S.A. § 201(3) (Supp.1998).[2] Finding no error, we affirm the judgment.

[¶ 2] Harold Pulsifer voluntarily admitted himself to the Augusta Mental Health Institute (AMHI) in 1992 after repeatedly receiving extended residential treatment over the course of the previous six years. He was diagnosed with schizoaffective disorder, which is a combination of schizophrenia, a thought disorder, and major depression or bipolar/manic depression, a mood disorder. This disorder is characterized by a lack of insight which means that he does not have the "ability to see his own illness, and to see his behavior in the way other people might." Pulsifer also has poor judgment and a distorted view of situations, lacks initiative, and is often withdrawn.

[¶ 3] Wrendy Hayne had been admitted to AMHI in 1980 at the age of seventeen. About a year before Hayne's death, a romance developed between Hayne and Pulsifer and they began spending more time together. Hayne's family initially was not opposed to the relationship. The AMHI staff described the relationship as a "high school type relationship." Staff members witnessed them holding hands, sitting close to each other, and kissing each other before they returned to their rooms.

[¶ 4] In December of 1995, Hayne and Pulsifer attended a holiday party together. Following the party, Hayne assaulted a staff member, resulting in Hayne being restricted for four or five days. Around this time, Hayne's mother noticed that Hayne had begun regressing. Hayne spent all her time with Pulsifer and no longer attended the different programs she previously had attended. Staff members noted that she became "increasingly more delusional, increasingly more assaultive." Hayne's mother asked the staff to strictly monitor Hayne's relationship with Pulsifer, and to limit the time the two individuals could spend together. As a result, Pulsifer was allowed to visit Hayne on her ward only at certain times and only if supervised by a staff member.

[¶ 5] The restrictions, however, did not stop Hayne and Pulsifer from spending time together. To ensure that he would continue to see Hayne, Pulsifer set up his can collecting "business" outside her building where he could have a view of her room. During the winter, he dug a trench in the snow alongside the basement of her building to establish a meeting place. Moreover, Pulsifer found a set of keys that granted him access to many of the AMHI buildings and rooms. Hayne would meet Pulsifer outside her building and then they would find a place where they could spend time together.

[¶ 6] On April 2, 1996, Pulsifer became visibly angry with Hayne in front of a staff member, swore at her, and ripped an Easter card she had received from her parents. Pulsifer testified that he was angry with a staff member and not with Hayne. As a result of this incident, the staff placed Hayne under the constant "one-on-one" supervision of staff members. On another occasion, a nurse "observed [Pulsifer] yelling at [Hayne], ... threatening her, ... following her." Pulsifer told Hayne "not to listen to what the staff said for her to do."

[¶ 7] On April 3rd, Pulsifer was told that Hayne was afraid of him and did not want to associate with him any longer, and that Hayne's mother would obtain a restraining order if he continued to bother Hayne. Pulsifer voluntarily agreed to stay away from Hayne, but requested to speak to Hayne's

---

1. 17–A M.R.S.A. § 201(1)(A) provides: "A person is guilty of murder if ... [h]e intentionally or knowingly causes the death of another human being."

2. 17–A M.R.S.A. § 201(3) states, "It is an affirmative defense to a prosecution under subsection 1, paragraph A, that the actor causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation." Causing the death of another person while under the influence of extreme anger or extreme fear brought about by adequate provocation constitutes a mitigating circumstance and reduces murder to manslaughter. 17–A M.R.S.A. § 203(1)(B).

mother as a condition of his agreement. According to the staff members, Pulsifer did not appear angry or upset during the meeting. Because of Pulsifer's cooperative attitude, Hayne's one-on-one supervision was lifted the following day. Thereafter, the staff required Hayne to check-in every thirty minutes and required Pulsifer to check-in every hour. Between check-ins, both individuals were free to roam the grounds of AMHI.

[¶ 8] On April 4th, Pulsifer told a mental health worker that he loved Hayne and "he didn't understand why [Hayne's] parents didn't want him to be with [Hayne] any more." The mental health worker testified that Pulsifer was confused, but not angry, and that he told her that he would abide by Hayne's parents' wishes. Despite that pledge, Hayne and Pulsifer secretly met during that afternoon. Pulsifer did not see Hayne at all on April 5th because she slept most of the day. According to Pulsifer, he was becoming increasingly worried that he would not see Hayne again.

[¶ 9] Around 11:00 a.m. on the morning of April 6th, Pulsifer was outside counting his cans when Hayne approached him. Pulsifer asked Hayne whether she had talked to her mother about their relationship. Hayne told him that she had not talked to her mother, but that the staff had. As Hayne started to walk back to her unit to check in and have lunch, a staff member heard Hayne say to Pulsifer, "See ya. Love ya." Hayne was delusional at lunch time and was administered medication. Although a nurse told Hayne to remain in the unit while she settled down, Hayne went back to see Pulsifer after lunch.

[¶ 10] Pulsifer and Hayne met secretly in a storage room Pulsifer was able to access with the keys he had found. Pulsifer testified that they talked about their relationship for another thirty minutes and he began to believe that Hayne's mother had made decisions about their relationship of which he was not informed. As the time for Hayne to return to her unit to check in approached, Pulsifer grabbed the knife that he used in his can collecting business and stabbed Hayne multiple times. Pulsifer testified that he stabbed Hayne because "[he] thought [he]

was going to lose her and never see her again." He further testified, however, that Hayne did not tell him that she did not love him or that she did not want to see him again.

[¶ 11] A janitor found Hayne in the storage room at about 1:15 p.m., after he saw Pulsifer leave that area. She had been stabbed at least six times, had lost a significant amount of blood, and had no pulse. Although the stab wounds did not sever any vital organs or major arteries or veins, Hayne died as a result of hemorrhaging caused by the wounds. When Pulsifer was found, his clothes were stained with blood that was later determined to be the same type of blood as Hayne's.

[¶ 12] After a jury waived trial, the trial court found Pulsifer guilty of intentionally or knowingly murdering Hayne, and found that his defense of adequate provocation was insufficient. It is the failure to find adequate provocation on which Pulsifer's appeal is grounded.

█ [¶ 13] "It is an affirmative defense to a prosecution under [section 201(1)(A)] that the actor causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation." 17–A M.R.S.A. § 201(3) (Supp.1998). Adequate provocation is a statutorily prescribed affirmative defense that must be proved by the defendant by a preponderance of the evidence. *See* 17–A M.R.S.A. § 101(2) (1983). If proved, it reduces murder to manslaughter. 17–A M.R.S.A. § 203(1)(B). The defendant has the burden of establishing that he (1) caused the death while under the influence of extreme anger or extreme fear, and (2) that such extreme fear or extreme anger was brought about by provocation that was legally sufficient to reduce the crime from murder to manslaughter, *i.e.*, that the provocation was sufficient to allow the factfinder to conclude that it was "reasonable for [him] to react with extreme anger or extreme fear." 17–A M.R.S.A. § 201(4); *see State v. Cumming*, 634 A.2d 953, 957 (Me.1993). In this case, the trial court took into consideration Pulsifer's mental illness and found

... It is undisputed, clearly found from the evidence that the defendant was under the influence of extreme anger and extreme fear at the time of the confrontation. The provocation was real, and from any basis, any subjective basis, including his abnormal condition of the mind and his lack of insight, he was ... fully provoked from anger or fear

That finding is not sufficient, however, to trigger the application of section 203(1)(B) and reduce the crime of murder to manslaughter. In addition, the provocation must be legally adequate, *i.e.*, it cannot be self-induced and the defendant's reaction to it must be objectively reasonable. Section 201(4) provides:

[P]rovocation is adequate if ... [i]t is not induced by the actor ... and ... [i]t is reasonable for the actor to react to the provocation with extreme anger or extreme fear, provided that evidence demonstrating only that the actor has a tendency towards extreme anger or extreme fear shall not be sufficient, in and of itself, to establish the reasonableness of his reaction.

17–A M.R.S.A. § 201(4) (Supp.1997).

 [¶ 14] Having found that Pulsifer was under the influence of extreme fear or extreme anger the trial court further concluded that the provocation was not legally adequate:

[T]he defendant's refusal to accept the restrictions induced by the staff of AMHI or to otherwise deal with them was, to some extent, self-induced. The stress which apparently led up to his avalanche of emotions took place over a period of time, and there is no evidence of any particular triggering factor, so that there is an element of remoteness with respect to that provocation. And under any circumstance, this court can not find in the application of a standard of just and reasonable person, because of the efforts of others to interfere with the romantic relationship, that it was adequate provocation to create such rage

from fear or anger as to be reasonable under the circumstances.

Because the adequacy of the provocation is a conclusion of fact to be determined by the trier of fact, *see State v. Flick*, 425 A.2d 167, 172 (Me.1981),[3] and the trier of fact made a factual finding adverse to the party with the burden of proof, we will overturn the trial court's finding of inadequate provocation only if the record compels a contrary conclusion, *see State v. Brown*, 675 A.2d 504, 505 (Me. 1996).

 [¶ 15] The trial court found that Pulsifer's "refusal to accept the restrictions induced by the staff of AMHI or to otherwise deal with them was, to some extent, self-induced." Pulsifer had the burden of proving that he did not instigate or create the event that ultimately provoked him to commit the crime. *See State v. Michaud*, 611 A.2d 61, 63–64 (Me.1992) (defendant failed to meet his burden of demonstrating that he did not instigate the fight); *State v. Rainey*, 580 A.2d 682, 685 (Me.1990) (although fear of the victim provoked the defendant to commit the crime, the provocation was not adequate because the defendant had no legal right to be on the property). Pulsifer initiated the conversation he had with Hayne about their relationship preceding the fatal attack. By meeting with Hayne and discussing their relationship, Pulsifer placed himself in a situation that would arouse his anger and fear.

 [¶ 16] Moreover, the trial court further found that it was not objectively reasonable for Pulsifer to react with extreme anger or extreme fear to what it was that provoked him. Pulsifer contends that his actions must be viewed subjectively, and that his mental illness necessitates a reduction of the crime from murder to manslaughter. We disagree. Although the determination of whether a defendant acted under the influence of extreme anger or extreme fear is necessarily subjective, the legal adequacy of the provocation must be measured objectively. *See State v. Rollins*, 295 A.2d 914, 921 (Me.1972); *see also State v. Park*, 159 Me. 328, 332–33, 193 A.2d 1 (1963) (provocation is not legally suffi-

---

**3.** The court must first determine whether the evidence presented is legally sufficient to generate the affirmative defense to warrant a presenta-

tion of the factual question of the adequacy of provocation to the fact-finder. *See State v. Michaud,* 611 A.2d 61, 63 (Me.1992).

cient to reduce the severity of the change unless it is of a character that would stir resentment to violence endangering life in the mind of a just and reasonable person).

[¶ 17] Extreme anger and fear resulting from the efforts of others to interfere with a romantic relationship would not cause a reasonable man to stab the woman who is the object of his affection. We have previously rejected similar contentions. *See Cumming*, 634 A.2d at 957 (divorced man was not adequately provoked when he found a note suggesting his former wife had formed a new relationship); *Tribou v. State*, 552 A.2d 1262, 1263–64, 1265 (Me.1989) (divorced man not adequately provoked when he observed his former wife in a lounge dancing with another man).

■ [¶ 18] The trial court correctly rejected the adequate provocation defense.[4]

The entry is:

Judgment affirmed.

4. Pulsifer also questions the trial court's partial reliance on the remoteness of the provocation in ruling that the provocation was not legally adequate. The reasonableness of a defendant's provocation does depend in part on the extent of the lapse of time between the onset of the extreme fear and the violent act. *Rainey*, 580 A.2d at 685 (Me.1990); *see also Flick*, 425 A.2d at 173. Pulsifer's anger developed over several days, perhaps weeks. Since the beginning of 1996, the AMHI staff gradually had placed more restrictions on the amount of time Pulsifer and Hayne could spend together. At the April 3rd meeting, the staff requested a permanent end to their relationship. The extended period through which these events spanned decreases the reasonableness of Pulsifer's extreme reaction.