2011 ME 53

**Jeffrey A. COOKSON**

v.

**STATE of Maine.**

Supreme Judicial Court of Maine.

Argued: Jan. 13, 2011.
Decided: May 3, 2011.

Karen E. Wolfram, Esq. (orally), Daniel G. Lilley Law Offices, Portland, ME, for Jeffrey Cookson.

Janet T. Mills, Attorney General, Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, GORMAN, and JABAR, JJ.

Majority: SAUFLEY, C.J., and LEVY, SILVER, GORMAN, and JABAR, JJ.

Dissent: ALEXANDER, J.

GORMAN, J.

[¶ 1] In this post-conviction matter, Jeffrey A. Cookson challenges the decision of the Superior Court (Penobscot County, *Cole, J.*) denying his petition for DNA testing of items belonging to an alternative suspect in connection with Cookson's 2002 conviction of two counts of intentional or knowing murder, 17–A M.R.S.A. § 201(1)(A) (1983).[1] We vacate the decision and remand for further proceedings.

## I. BACKGROUND

[¶ 2] On October 15, 2002, the court entered a judgment on a jury verdict finding Cookson guilty of two counts of knowing or intentional murder, 17–A M.R.S.A. § 201(1)(A), for causing the deaths of his ex-girlfriend, Mindy Gould, and the twen-

---

**1.** Title 17–A M.R.S.A. § 201(1)(A) has since been amended.  P.L.2001, ch. 383, § 8 (effective Jan. 31, 2003).

ty-one-month-old son of Gould's best friend.[2] *State v. Cookson (Cookson I)*, 2003 ME 136, ¶¶ 1–2, 837 A.2d 101, 104. The court sentenced Cookson to two consecutive life sentences. *Id.* ¶ 14, 837 A.2d at 106.

[¶ 3] During the trial, witness David Vantol confessed privately to Cookson's attorney and private investigator that he had committed both murders.[3] Immediately after the jury returned a verdict against Cookson, Cookson's attorney disclosed the confession to the court and to the prosecutor. Later that same day, Vantol led police to a spot in the woods where he unearthed a gun that the State's testing revealed was, in fact, the murder weapon.[4]

[¶ 4] Vantol also offered to provide police with clothing he claimed to have been wearing at the time he committed the murders, and which he indicated had been buried since the murders. Although Vantol had taken investigators to the spot where the gun was hidden, he refused to take them to where the clothing was kept. Instead, two days after leading police to the murder weapon, Vantol gave the investigators a trash bag containing several clothing items, including a pair of sneakers, a jean jacket, a plaid shirt, a black wig, and an orange hat. The clothing was moldy, damp, and soiled, and appeared to have been buried for "quite some time."

[¶ 5] During the next week, Vantol continued to confess to the murders, but because the police did not believe Vantol's confessions, they asked him to submit to a polygraph test. Some time after the police told Vantol that he had "failed" the polygraph, Vantol called one of the lead detectives, distraught that police did not appear to believe his confessions, and expressed that he was going to hurt himself or others to be taken seriously. As a result, Vantol was admitted to Acadia Hospital. Six days after entering the hospital, Vantol recanted his confessions, and told investigators that he obtained the clothing he had provided to them from a junk car and that the items were unrelated to the murders. The clothing remains in the State's possession.

[¶ 6] In December of 2004, and again in January of 2008, Cookson filed motions seeking DNA testing on the articles of clothing and other evidence provided to the investigators by Vantol pursuant to 15 M.R.S. §§ 2137, 2138 (2010).[5] Following a

2. The factual details of Cookson's conviction are set forth in *State v. Cookson (Cookson I)*, 2003 ME 136, ¶¶ 2–5, 837 A.2d 101, 104–05.

3. Initially, Vantol claimed he had committed both murders. Vantol later claimed that Cookson had arranged and/or participated in the murders.

4. The State's ballistic expert later explained that his trial testimony identifying another gun as the murder weapon had been inaccurate.

5. Title 15 M.R.S. § 2137(1) (2010) allows:
A person who has been convicted of and sentenced for a crime under the laws of this State that carries the potential punishment of imprisonment of at least one year and for which the person is in actual execution of [the] sentence ... may file a written post-judgment of conviction motion in the underlying criminal proceeding moving the court to order DNA analysis of evidence in the control or possession of the State that is related to the underlying investigation or prosecution that led to the person's conviction and a new trial based on the results of that analysis.

Section 2138 details the process for such DNA testing petitions:
1. **Filing motion.** A person authorized in section 2137 who chooses to move for DNA analysis shall file the motion in the underlying criminal proceeding. The motion must be assigned to the trial judge or justice who imposed the sentence unless that judge or justice is unavailable, in which case the appropriate chief judge or chief justice shall assign the motion to another judge or justice. Filing and service must be made in accordance with Rule 49 of the Maine Rules of Criminal Procedure.

testimonial hearing, the court denied Cookson's request for DNA testing as to the bulk of Cookson's request, including the items of clothing provided by Vantol. We granted Cookson a certificate of probable cause to pursue this appeal pursuant to 15 M.R.S. § 2138(6) and M.R.App. P. 19.

## II. DISCUSSION

■ [¶ 7] Cookson challenges the court's interpretation of 15 M.R.S. § 2138, which dictates the process by which a defendant may seek DNA analysis of evidence by post-conviction motion. *See James v. State*, 2008 ME 122, ¶ 11, 953 A.2d 1152, 1155. Section 2138 requires the court to order DNA analysis if the moving party presents prima facie evidence of five criteria:

A. A sample of the evidence is available for DNA analysis;

B. The evidence to be tested has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way;

C. The evidence was not previously subjected to DNA analysis or, if previously analyzed, will be subject to DNA analysis technology that was not available when the person was convicted;

D. The identity of the person as the perpetrator of the crime that resulted in the conviction was at issue during the person's trial; and

E. The evidence sought to be analyzed, or the additional information that the new technology is capable of providing regarding evidence sought to be reanalyzed, is material to the issue of whether the person is the perpetrator of, or accomplice to, the crime that resulted in the conviction.

15 M.R.S. § 2138(4–A).

■ [¶ 8] "Prima facie" in this context regards the preliminary burden of production of evidence; it requires proof only of "enough evidence to allow the fact-

....

**4–A. Standard for ordering DNA analysis.** The court shall order DNA analysis if a person authorized under section 2137 presents prima facie evidence that:

A. A sample of the evidence is available for DNA analysis;

B. The evidence to be tested has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way;

C. The evidence was not previously subjected to DNA analysis or, if previously analyzed, will be subject to DNA analysis technology that was not available when the person was convicted;

D. The identity of the person as the perpetrator of the crime that resulted in the conviction was at issue during the person's trial; and

E. The evidence sought to be analyzed, or the additional information that the new technology is capable of providing regarding evidence sought to be reanalyzed, is material to the issue of whether the person is the perpetrator of, or accomplice to, the crime that resulted in the conviction.

**5. Court finding; analysis ordered.** The court shall state its findings of fact on the record or shall make written findings of fact supporting its decision to grant or deny a motion to order DNA analysis. If the court grants a motion for DNA analysis under this section, the crime lab shall perform DNA analysis on the identified evidence and on a DNA sample obtained from the person.

**6. Appeal from court decision to grant or deny motion to order DNA analysis.** An aggrieved person may not appeal as a matter of right from the denial of a motion to order DNA analysis. The time, manner and specific conditions for taking that appeal to the Supreme Judicial Court, sitting as the Law Court, are as the Supreme Judicial Court provides by rule. The State may not appeal from a court order to grant a motion to order DNA analysis.

....

15 M.R.S. § 2138 (2010).

trier to infer the fact at issue and rule in the party's favor."[6] *Anderson v. State,* 831 A.2d 858, 865–66 (Del.2003) (quotation marks omitted); *accord Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Prima facie evidence requires only "some evidence" on every element of proof necessary to obtain the desired remedy. *Weldon v. Hawkins,* 183 Ill.App.3d 525, 131 Ill.Dec. 876, 539 N.E.2d 229, 231 (1989). Thus, prima facie proof is a "low standard" that does not depend on the reliability or credibility of the evidence, all of which may be considered at some later time in the process. *Id.; Zapata–Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 44 (1st Cir.2002).

[¶ 9] In evaluating whether a moving party has satisfied all five criteria on a prima facie basis, section 2138 expressly requires that "[t]he court shall state its findings of fact on the record or shall make written findings of fact supporting its decision to grant or deny a motion to order DNA analysis." 15 M.R.S. § 2138(5). When findings are required by statute, they "must be stated with sufficient specificity to permit understanding and meaningful appellate review." *Schwartz v. Unemployment Ins. Comm'n,* 2006 ME 41, ¶ 10, 895 A.2d 965, 970. In denying Cookson's motion as to Vantol's clothing, however, the court gave only a legal analysis of the statute and its ultimate conclusion that Cookson failed to meet the chain of custody requirement of section 2138(4–A)(B); the judgment contains no findings of fact as to chain of custody, or findings or conclusions as to any of the other criteria of section 2138(4–A). We must therefore vacate the court's

judgment and remand the matter to the Superior Court for it to issue the findings required by section 2138(5) as to all five criteria on Cookson's post-conviction DNA motion.

[¶ 10] We also clarify the requirement of chain of custody in section 2138(4–A)(B) because, despite the lack of findings, the court's legal interpretation of that criterion is squarely presented to us. We examine de novo the meaning of section 2138(4–A)(B) by looking first to its plain language in light of the whole statutory scheme. *See State v. Aboda,* 2010 ME 125, ¶ 10, 8 A.3d 719, 722.

[¶ 11] Although the post-conviction DNA statute does not define "chain of custody," the phrase is a legal term of art. The Ninth Circuit Court of Appeals is credited with the first statement of the chain of custody requirement: "Before a physical object connected with the commission of a crime may properly be admitted in evidence there must be a showing that such object is in substantially the same condition as when the crime was committed." *Gallego v. United States,* 276 F.2d 914, 917 (9th Cir.1960). Maine Rule of Evidence 901 likewise requires that, to be admissible at trial, evidence must be authenticated in a manner "sufficient to support a finding that the matter in question is what its proponent claims," *State v. Thompson,* 503 A.2d 689, 691 (Me.1986) (quotation marks omitted), by establishing a "continuity of possession," *State v. Thibodeau,* 353 A.2d 595, 602 (Me.1976) (quotation marks omitted), that "account[s] for the custody of the object from the time it figured in the events in question until its appearance in the courtroom," Field &

---

6. This is distinguished from the meaning of "prima facie" in other contexts regarding the burden of persuasion, which is to "denote the establishment of a legally mandatory, rebuttable presumption." *Tex. Dep't of Cmty. Affairs*

*v. Burdine,* 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); 9 John Henry Wigmore, Evidence in Trials at Common Law § 2494 (Chadbourn rev. 1981).

Murray, *Maine Evidence* § 901.3 at 542 (6th ed.2007).

[¶ 12] Identifying the initial link in the chain of custody, i.e., from what time the proponent must account for the item's whereabouts and safekeeping, is a matter of dispute in the instant appeal. The State concedes that an adequate chain of custody exists from the time that police took possession of the clothing provided by Vantol, but the State and Cookson disagree as to whether the two years that passed between the time of the crime itself and the time Vantol gave the clothing to police is relevant to the chain of custody requirement for post-conviction DNA testing purposes.

[¶ 13] Many decisions from Maine and elsewhere discuss chain of custody only from the time an item comes into police possession. *See, e.g., State v. Lobozzo,* 1998 ME 228, ¶ 10, 719 A.2d 108, 110 (considering the chain of custody in terms of the collection of the evidence by police from the crime scene, transportation of the evidence to the police station, and maintenance of the evidence in police storage); *State v. Vanassche,* 566 A.2d 1077, 1079 (Me.1989) (discussing "[w]hether the exhibits had been tampered with while in the custody of the police" (quotation marks omitted)); *Illinois v. Moore,* 377 Ill.App.3d 294, 316 Ill.Dec. 367, 879 N.E.2d 434, 438 (2007) (referring to the defendant's duty to "establish a chain of custody from the Chicago police department").

[¶ 14] In several cases, however, some period of time before the evidence comes into police possession has been considered relevant in a chain of custody analysis. In *State v. Lagasse,* for example, a witness removed the murder weapon from the scene of the crime and retained it for five days before turning it over to police. 410 A.2d 537, 540–41 (Me.1980). We upheld the admission of the weapon at trial, over the defendant's Rule 901 objection, based on the testimony of the witness regarding his taking and retention of the weapon, combined with the stipulation of a complete chain of custody once the weapon was in police possession. *Id.*

[¶ 15] Similarly, in *State v. Morris,* the defendant challenged the admission of a stolen gun. 440 A.2d 1035, 1036 (Me. 1982), superceded on other grounds as recognized in *State v. Nile,* 557 A.2d 950, 952 (Me.1989). We held that "[t]he State's witnesses accounted for the weapon's chain of custody, except for the ten-day period between the theft and the subsequent recovery by the police," and that the possibility of tampering during that time, without more, affected only the weight of the evidence rather than its admissibility. *Id.; see also Nebraska v. Phelps,* 273 Neb. 36, 727 N.W.2d 224, 228 (2007) (including, in a chain of custody analysis, the three-month period between the victim's disappearance and the discovery of her clothing).

[¶ 16] In addition, chain of custody is often considered to begin when an emergency room physician or nurse obtains a sample of biological material from a victim or a defendant, rather than when that practitioner turns the sample over to police. *See, e.g., Thompson,* 503 A.2d at 690–91 (involving a private lab's drawing of a blood sample); *State v. Libby,* 453 A.2d 481, 488 (Me.1982) (discussing the physician's drawing of a blood sample from the defendant as the initial link in the chain of custody).

■ [¶ 17] The central point of the chain of custody requirement is to assure that the evidence is what it purports to be—that is, related to the crime—and that it has not been contaminated or tampered with such that testing of it will yield unreliable (and therefore irrelevant) results. *See* Field & Murray, *Maine Evidence* § 901.3 at 542. To that end, consideration of the chain of custody must include any

period of time during which an opportunity for contamination or tampering existed. When police seize evidence from a crime scene immediately after the crime has occurred, the relation of that evidence to the crime is established by its proximity to the scene. Because the opportunity for tampering or contamination is likely to include only the time the evidence is in police possession, many decisions discuss only that time frame.[7] In contrast, when, as here, there is some period of time between the commission of the crime and the police possession of the related evidence, chain of custody must account for the item's whereabouts from the time of commission of the crime and including once the police take possession. In short, the temporal scope of the chain of custody depends on the context of the particular crime and the events surrounding the discovery and retention of the evidence in question.

[¶ 18] We conclude that the temporal scope of chain of custody in this case includes the period of time before the police took possession of the clothing; the period of time after the commission of the crimes up until Vantol provided the clothing to police presents a lengthy opportunity for contamination or tampering. It is therefore Cookson's burden to account for the clothing's chain of custody from the time of the murders to the present day.

The entry is:

Judgment vacated and remanded to the Superior Court for findings of fact and conclusions of law consistent with this opinion pursuant to 15 M.R.S. § 2138 (2010).

**ALEXANDER, J., dissenting.**

[¶ 19] I respectfully dissent. The purpose of the DNA testing statutes, 15 M.R.S. §§ 2137, 2138 (2010), is to allow persons who allege that they have been wrongly convicted of serious crimes to seek DNA analysis of evidence "in the control or possession of the State that is related to the underlying investigation or prosecution," 15 M.R.S. § 2137(1). That DNA analysis may be ordered only if the moving party presents "prima facie evidence that" the evidence to be tested "has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way." 15 M.R.S. § 2138(4-A)(B). Further, the evidence must be "material to the issue of whether the person is the perpetrator of, or accomplice to, the crime that resulted in the conviction." *Id.* § 2138(4-A)(E). If the testing results are favorable and can exclude the person as the perpetrator, or an accomplice of the perpetrator, of the crime, the moving party must demonstrate by clear and convincing evidence that the results demonstrate actual innocence or that the moving party is otherwise entitled to a new trial. *Id.* § 2138(10).

[¶ 20] Discussing the origins of judicial interpretation of the chain of custody requirement, this Court's opinion observes:

The Ninth Circuit Court of Appeals is credited with the first statement of the chain of custody requirement: "Before a physical object connected with the commission of a crime may properly be admitted in evidence there must be a showing that such object is in substantially the same condition as when the

---

**7.** Of course, material that will be evidence of a crime can be contaminated contemporaneously with or even before the occurrence of the crime. *See, e.g., Kyles v. Whitley,* 514 U.S. 419, 428–32, 445–49, 115 S.Ct. 1555, 131

L.Ed.2d 490 (1995) (affording the defendant post-conviction relief based on the State's failure to disclose exculpatory evidence supporting the defense theory that a witness had "planted evidence" against the defendant).

crime was committed." *Gallego v. United States,* 276 F.2d 914, 917 (9th Cir. 1960).

[¶ 21] In *Gallego,* the Ninth Circuit listed the relevant factors in a chain of custody analysis, including "the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it." 276 F.2d at 917, *cited with approval in State v. Lewis,* 401 A.2d 645, 647 (Me. 1979). Thus, based on precedent cited by this Court, a proponent of evidence must demonstrate that the material at issue (1) is in substantially the same condition as when the crime was committed, and (2) has been preserved or maintained in a manner that minimizes the likelihood of intermeddlers tampering with it.

[¶ 22] The clothing material at issue here meets none of the judicial prerequisites for a credible chain of custody, and it fails to meet each of the statutory prerequisites to order DNA testing. For two years, while the State's investigation was ongoing, it was not in the State's possession or control; it has been subject to conflicting tales of its origin and condition when the crime was committed; there were lots of opportunities and incentives for tampering; and the proffered "evidence" might show that Cookson had help in committing the murders, but it would not exclude his criminal liability.

[¶ 23] Instead, the history of the case—well known to the trial judge—demonstrates that this effort was an attempt to reopen and reargue a previously denied motion for a new trial, a denial that we affirmed on appeal. *See State v. Cookson,* 2003 ME 136, ¶¶ 28–35, 837 A.2d 101, 110–11. As recited in our 2003 opinion, the portion of that history relevant to the pending appeal is as follows:

> The bodies of Mindy Gould, age twenty, and [a boy], age twenty-one months, were discovered in Gould's sister's home in Dexter on the morning of December 3, 1999. Gould had been residing in her sister's home, and that morning Gould was babysitting ... the son of her best friend. Both Gould and [the boy] were found lying face down on a bed with pillows over their heads. They died from single gunshots to their heads, through the pillows, from a 9mm gun.
>
> The police investigation immediately centered on Cookson. Gould and Cookson had resided together, off and on, from the time Gould was seventeen. They had lived at Cookson's mobile home in New Gloucester, and they had resided together for a short time at Gould's sister's home in Dexter. Gould had attempted to separate from Cookson, and a month before her death, she obtained a temporary protection from abuse order against Cookson following an incident in which he threatened her and the police were called. In spite of the protection order, which prohibited Cookson from having any contact with Gould, he stalked her. After a court hearing on November 30, 1999, at which Gould and Cookson appeared, the court issued a final protection order which was served on Cookson.... At Cookson's murder trial, several witnesses described the relationship between Cookson and Gould and testified about Cookson stalking Gould....
>
> ....
>
> Cookson was arrested and charged with the murders of Gould and [the boy]. He was denied bail. The jury trial began on November 27, 2001, and concluded with the guilty verdicts on December 6, 2001. The State argued to the jury that Cookson had a motive to kill Gould because she left him and he was losing control over her. The State emphasized that Cookson possessed the weapon that was used to kill Gould and [the boy]. The defense theory was that Cookson,

who had denied to the police any involvement with the murders, was sleeping on his brother's couch, as his brother testified, at the time of the murders. Cookson chose not to testify. The defense did not challenge the opinions of the firearms experts or offer evidence on the murder weapon.

Immediately after the jury returned the guilty verdicts, the defense counsel requested a conference with the court. Cookson's attorneys disclosed that during the course of the trial they and their investigator met with David Vantol, a prospective witness whom they believed would corroborate Cookson's alibi. Instead, Vantol confessed to the murders and to knowing the location of the murder weapon. Cookson's defense team did not think that Vantol's confession was credible enough to call him as a witness. At a subsequent meeting before the trial was concluded, Vantol again confessed to the defense attorneys that he killed Gould and [the boy]. However, at this second meeting he implicated Cookson as having arranged or participated in the killings. Because Vantol's second confession would be harmful to Cookson, the attorneys, with Cookson's knowledge, decided not to call Vantol to testify. In the conference with the court after the trial, the defense attorneys described Vantol's confession to the court but made no motion at that time.

The case was continued for sentencing, and shortly after the trial, Cookson moved for a new trial on four grounds, three of which were on the basis of newly discovered evidence: (1) the murder weapon was discovered after trial; (2) the firearms expert learned of an error in his testimony; and (3) Vantol's confession. The fourth ground was the claim that Cookson's due process rights were violated because of the false evidence of the firearms expert.

A hearing was held on the motion at which the following facts emerged. The police interviewed Vantol the same day that Cookson's trial ended, and Vantol led them to a 9mm gun hidden under a rock, which he claimed was the weapon he used to shoot Gould and [the boy]. This gun was a Taurus Model PT–92, not the Taurus Model PT–99–AF that figured prominently in Cookson's trial. The recovered gun was tested, and the expert testimony at the motion hearing was that the Taurus Model PT–92 was the gun that killed Gould and [the boy].

. . . .

The police conducted several interviews with Vantol after the trial, and he claimed to have killed Gould and [the boy]. Vantol told the police that Cookson offered to pay him $10,000 to kill Gould and that Cookson drove Vantol to Gould's sister's house on the morning of the murders. Once inside the residence, Vantol said that he pulled the gun on Gould, and when she ran to the bedroom, he shot her. According to Vantol, he then shot [the boy].

After Vantol's confession to the police, he received treatment at a psychiatric hospital, and he recanted his confession to his psychiatrist. Vantol testified at the motion hearing that he was not involved with the killing of Gould and [the boy]. He testified that Cookson, whom he had visited in jail on several occasions, told him what to say and provided him with all of the details. Vantol said he first confessed to Cookson's lawyers, telling them that he had shot Gould in self-defense. It did not appear that Cookson's lawyers believed him, and when Vantol visited Cookson in jail, Cookson told him to tell the lawyers another version. A jail official testified and corroborated the dates of Vantol's visits to Cookson. Vantol's psychiatrist testified that Vantol had low intelligence,

functioned at the level of a twelve or thirteen-year-old, and was easily influenced by others. The court found that Vantol was truthful at the motion hearing and that he had fabricated his confession at Cookson's instigation.

The court denied Cookson's new trial motion, finding that he had failed to demonstrate that the murder weapon could not have been discovered before trial by the exercise of reasonable diligence. The court also held that because Vantol's confession was made to the defense team before the conclusion of the trial, it was not newly discovered evidence. With regard to the erroneous testimony of the firearms expert, the court held that the error could have been discovered before trial by reasonable diligence, and was, therefore, not newly discovered. Because the expert's opinion was based on a mistake and was not an intentional falsehood, the court concluded that Cookson was not denied due process.

*Id.* ¶¶ 2–3, 6–9, 11–13, 837 A.2d at 104–06.

[¶ 24] We affirmed denial of Cookson's motion for a new trial, noting that, as relevant to this appeal:

> Vantol's confession was known to Cookson during the trial and is not newly discovered evidence. For tactical reasons, Cookson and his attorneys decided not to disclose the confession during trial or call Vantol to testify. A confession by an alternative suspect known to the defense at the time of trial is not newly discovered evidence. Thus, Cookson has failed to demonstrate by clear and convincing evidence that Vantol's confession was newly discovered.
>
> Even if the confession was newly discovered, Cookson did not show clearly and convincingly that it would have changed the outcome of the trial. The motion court found that Vantol's confession was not credible. This finding is supported by the evidence of the versions of the confession that Vantol made to the defense team and to the police; Vantol's visits to Cookson in jail and the timing of those visits; Vantol's recantation; and his mental and psychological characteristics. Furthermore, the version of Vantol's confession that he gave to the police implicated Cookson in a murder for hire scheme, which, as the trial court noted at Cookson's sentencing, would have made Cookson guilty of murder and supported a life sentence.

*Id.* ¶¶ 33–34, 837 A.2d at 111 (citations omitted).

[¶ 25] As a matter of trial strategy, and because the defense did not believe Vantol to be credible, Cookson elected not to present Vantol's evidence at trial. Instead, Cookson waited until after the guilty verdict and then, things not having gone his way, Cookson pointed the finger at Vantol, asserting that he, Cookson, was innocent and that Vantol was the guilty party. By then, the allegedly exculpatory evidence that is the subject of this proceeding had been in Cookson's and/or Vantol's control where it could have been "substituted, tampered with, replaced or altered in a material way" for approximately two years.

[¶ 26] Tampering could have been accomplished because Cookson, who had been in a relationship with one of the murder victims, could have had access to, or advised Vantol how to get access to, DNA materials to place on the clothing. Further, the clothing offered for testing is of uncertain origin. It could have been Cookson's clothing, Vantol's clothing, clothing one of them wore at the time of the murders, or not, or, as Vantol had most recently claimed, clothing that he found in some old car. The clothing certainly was not evidence "in the control or possession of the State that is related to

the underlying investigation or prosecution," 15 M.R.S. § 2137(1), until, two years after the fact, it was turned over to the State after trial. Like the Vantol "confession," the clothing was known, or with due diligence could have been recovered, and could have been disclosed or presented at trial by Cookson, but not by the State.

[¶ 27] We should not countenance practices that, as trial strategy, elect not to disclose allegedly relevant testimony and material evidence and then, after trial, and after plenty of time for tampering, disclose that evidence for the first time, turn it over to the State, and then invoke the DNA statute to seek a new trial. Notably, the precedents cited by this Court to support the position that there may be a chain of custody of evidence "in the control or possession of the State" all involve evidence that came into the State's possession days, weeks, or months after the commission of the crime, but during the State's investigation of the crime and before trial. None involve evidence known only to the defense or defense counsel before completion of trial that the defense then tried and failed to claim was newly discovered evidence to support a new trial.

[¶ 28] The problems with Cookson's claim for DNA testing are emphasized by comparing Cookson's claim to a more common claim for DNA testing, as recently addressed by the United States Supreme Court in *Skinner v. Switzer*, 562 U.S. ——, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011). *Skinner* also involved the murder of a defendant's girlfriend and, there, two children in her home; an allegation of an alternative suspect; and a strategic choice not to reference evidence that might be tested for DNA at trial for fear it would harm the defendant's position. *Id.* at ——, 131 S.Ct. at 1293–95. But Skinner differs from the instant case in three critical respects. First, the evidence that Skinner sought to have tested for DNA

was seized by the police at the crime scene upon discovery of the crime. *Id.* at ——, 131 S.Ct. at 1294–95. Second, following commission of the crime, the evidence was never in the defendant's or an accomplice's exclusive possession, or its whereabouts known only to the defendant and his attorneys. *Id.* Third, the prosecution acknowledged the integrity of the chain of custody of the evidence Skinner sought to have tested. *Id.* at ——, 131 S.Ct. at 1295 n.5. With this history, the Skinner Court vacated a dismissal of Skinner's action and remanded for further proceedings to determine if the state court's refusal to order DNA testing of certain items of evidence was violative of Skinner's rights pursuant to 42 U.S.C.S. § 1983 (2002). *Id.* at ——, 131 S.Ct. at 1298–1300.

[¶ 29] To suggest that the trial court in this case erred in refusing to order DNA testing of this "evidence" with its very questionable chain of custody, even by the several stories of the person who claimed to have custody, would invite all sorts of post-trial mischief by persons who may have access to material they claim to be evidence and who have had the opportunity to tamper with that material in hopes of changing the result of the jury trial.

[¶ 30] Section 2138(4–A)(B) requires prima facie evidence directed to two issues, chain of custody and exclusion of tampering. The record supports the Superior Court's determination that, relying on Vantol's several versions of the source of the "evidence," Cookson had failed to demonstrate credible, prima facie evidence of a chain of custody of this material that was, as required by the DNA testing statute, "sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way." 15 M.R.S. § 2138(4–A)(B). This Court's opinion addresses the first issue, prima facie evidence of chain of custody,

suggesting that the most favorable of Vantol's several versions of the origin of the clothing should be accepted by the trial court. On the second issue in section 2138(4–A)(B), Cookson's failure to establish prima facie evidence of exclusion of tampering, this Court's opinion appears to recognize that Cookson failed to present credible prima facie evidence of the exclusion of tampering, and then remands to give Cookson a second chance to do so.

[¶ 31] At hearing, Cookson had the burden of proof on both issues. A party bearing the burden of proof at a hearing can prevail on a challenge to a finding that his burden has not been met only if he demonstrates that a contrary finding is compelled by the evidence. *See State v. Pulsifer*, 1999 ME 24, ¶ 14, 724 A.2d 1234, 1238; *see also Ma v. Bryan*, 2010 ME 55, ¶¶ 6, 8, 997 A.2d 755, 758–59. Here, the Superior Court was not compelled to conclude that Cookson had presented "prima facie evidence" that there was a sufficient chain of custody and that the evidence had not been subject to tampering or substitution when the asserted prima facie evidence, Vantol's testimony, provides conflicting versions of the origins and custody of that material during the two years before it was disclosed and turned over to the State and does not exclude opportunities for tampering.

[¶ 32] Vantol's alleged confession and his knowledge of the whereabouts of the murder weapon failed to serve as a basis for obtaining a new trial under the standard of review for denial of motions for a new trial applied in our 2003 opinion. That standard of review does not change, and Cookson should not be given the opportunity to present evidence that failed to justify his motion for a new trial by bootstrapping it through a DNA testing motion directed at material that was not "in the control or possession of the State," 15 M.R.S. § 2137(1), and for which Cookson failed to establish prima facie evidence of a chain of custody and exclusion of tampering.

[¶ 33] I would affirm the trial court's judgment.